**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-3198 & 15-3247
_____

ANDREW PAUL LEONARD,
d/b/a APL Microscopic
                    Appellant in No. 15-3247
                    v.

STEMTECH INTERNATIONAL INC;
STEMTECH HEALTHSCIENCES, INC.;
JOHN DOES 1-100, Inclusive,

        Stemtech International Inc and
        Stemtech HealthSciences, Inc,
                    Appellants in No. 15-3198
_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Nos. 1-08-cv-00067, 1-12-cv-00086)
District Judge: Honorable Leonard P. Stark
_____

Argued July 12, 2016
_____
Before: FUENTES, SHWARTZ, and RESTREPO, <u>Circuit</u>

Judges.

(Filed: August 24, 2016)

Kathleen M. Kushi Carter, Esq [ARGUED]
Christine R. Arnold, Esq.
Hollins Law
2601 Main Street
Suite 1300
Irvine, CA 92614

Thomas P. Leff, Esq.
Casarino Christman Shalk Ransom & Doss
405 North King Street
Suite 300, P.O. Box 1276
Wilmington, DE 19899
          Counsel for Appellants/Cross-Appellees

Jan I. Berlage, Esq. [ARGUED]
Gohn Hankey Stichel & Berlage
201 North Charles Street
Suite 2101
Baltimore, MD 21201

James S. Green, Sr., Esq.
Jared Green, Esq.
Seitz Van Ogtrop & Green
222 Delaware Avenue
Suite 1500, P.O. Box 68
Wilmington, DE 19899
          Counsel for Appellee/Cross-Appellant

_____

OPINION OF THE COURT
_____

SHWARTZ, <u>Circuit Judge</u>.

Andrew Leonard, a stem cell photographer, and Stemtech International, Inc., a company that sells nutritional supplements through independent distributors, cross appeal various rulings in the copyright infringement lawsuit Leonard brought against Stemtech in the District of Delaware. For the reasons discussed herein, we will affirm the District Court's pretrial, trial, and post-trial rulings, except the order denying prejudgment interest to Leonard, which we will vacate and remand.

I

A. Andrew Leonard's Images

Leonard takes photographs of stem cells using electron microscopes. Only a few photographers engage in this highly technical type of photography. Leonard obtains cell samples from doctors, scientists, and researchers and pays a scientific research institution to use an electron microscope to photograph the cells. The images first appear in black and white, and Leonard uses his "artistic judgment" to enhance the photos in color. J.A. 822-23.

Leonard created the images at issue in this case in the 1990s. Below are the two photographs at issue in this case.[1]

_____

[1] Leonard created these images in 1996 but did not register them with the U.S. Copyright Office until 2007, when he planned to bring this lawsuit.

3

The image on the left will be referred to as Image 3 and the right as Image 4.




Leonard markets his photographs through his business, APL Microscopic, and, during the relevant time period, used a stock photography agency known as Photo Researchers, Inc., to license his images.[2] He only allows limited licenses of his images because, in his view, unlimited usage licenses decrease the value of his work.

The licensing fee Leonard charges varies depending on whether his images are used for commercial, editorial, or educational purposes. Licensing fees are also impacted by the size, color, and the medium in which the images will appear.

During the 1990s and through the period at issue in this case, stem cell images were rare. At that time, Leonard's images were unique and sought after because there were very

---

[2] Photo Researchers, Inc., is now known as Science Source.

few photographers who had the technical skill necessary to produce such work. Even Stemtech's Chief Scientific Officer, Christian Drapeau, testified that Leonard's images were "extremely valuable." J.A. 1544.

In licensing his stem cell photographs, Leonard has received a range of fees, including a $4,000 fee for a non-exclusive license to use his image at trade shows for one year, $6,500 for a one-time, non-exclusive license to use one of his images on a university website for four years, and $1,325 for a one-time, non-exclusive license to use his image in a brochure with a print run of 5,000. He also received $1,500 from Time magazine, which featured one of his images of a human bone marrow stem cell on its August 7, 2006 cover.[3] Between 2007 and 2012, Photo Researchers licensed Leonard's images for fees ranging from less than $100 to several thousand dollars.

## B. Stemtech and its Distributors

Stemtech "formulates" and sells nutritional supplement products through thousands of distributors, J.A. 1387, who form the backbone of the company. Each distributor signs an agreement and is subject to Stemtech's policies and procedures manual. According to the manual, distributors are required to use only Stemtech marketing materials and its self-replicated websites. Specifically, the manual provides:

---

[3] Image 4 appeared on the cover of Time, albeit in a different pink and green color scheme. Because a feature on the cover of Time meant worldwide exposure of his work, Leonard charged a reduced fee for this editorial use.

> To promote both the products and the tremendous opportunity STEMTech offers, distributors <u>must</u> use the Marketing Materials and support materials produced by STEMTech. . . . Because the Internet recognizes no geographic borders (Domestic or Foreign), information on the Internet may be legal in one State or Country and illegal in another. Therefore, Distributors desiring to utilize an Internet web page to promote his/her distributorship <u>must</u> do so through the Company's official website, using official STEMTech replicated templates.

J.A. 2173-74 (emphasis and capitalization in original). Stemtech owns the domain and sub-domains of at least some of its distributors' websites, and Stemtech's vendor operates the server that hosts the Stemtech-supplied sites. Distributors who purchase a website from Stemtech may customize the site only to provide the distributor's name, phone number, email address, and a biography.

### C. Leonard and Stemtech's Initial Discussions

In May 2006, Stemtech contacted Leonard about using Image 4 for the "company['s] internal magazine," J.A. 869-70, and for use on its website. After discussing usage and color terms, Leonard provided Stemtech with a quote of $950 for a "one-year usage" of Image 4 in two places in Stemtech's HealthSpan magazine and a separate quote of $300 for a "one-year usage" of the image on the HealthSpan website. J.A. 871; 2120. Stemtech declined to license the image for website use because "the price was too high," J.A. 872, but chose to use the image twice in its magazine.

6

Leonard sent Stemtech an invoice for $950 for the two magazine placements, but was only paid $500. After multiple unsuccessful attempts to collect the $450 balance, Leonard abandoned his collection effort. Not only did Stemtech fail to pay Leonard in full, but it used his images without a license in its other promotional materials.

The images appeared on Stemtech websites, its distributors' websites, marketing DVDs, and other promotional and recruitment materials. Several Stemtech officials and employees explained that using these images was important to Stemtech's business. Chief Scientific Officer Drapeau explained: "If you talk about stem cells, you need [ ] support for the discussion, so you . . . show a cell showing what it's about . . . . It's a marketing thing. I understand [Leonard's images'] value totally. I mean, it's a good representation." J.A. 1539, 1544. George Antarr, Stemtech's Director of North American Sales, produced the DVD in which one of Leonard's images appeared, and explained the importance of a visual depiction of a stem cell in the video: "[W]e talked about stem cells in the product movie, so [ ] it would be good to show that, what one looks like . . . [b]ecause [a] visual [is] part of every sentence. A picture tells a thousand words." J.A. 1510. Thus, as Antarr noted, using a photograph was important to Stemtech's marketing efforts.

D.  Stemtech's Unauthorized Use

To make sure his images were not used for unauthorized purposes, Leonard "periodically" conducted internet searches for images of stem cells. J.A. 879-80. In October 2007, Leonard discovered his images on numerous

Stemtech and Stemtech-affiliated websites. He took screenshots of and archived the webpages on which his images appeared and retained copies of emails he sent to the contacts on various sites.

For example, Leonard found his images on "yourstems.com," a website selling a Stemtech product called Stem Enhance and in a Stemtech e-book featured on the website. J.A. 881, 889. He contacted the site operator, informed him of the infringing uses, requested an accounting of how long the operator used the images, and sought payment for their use. The website operator informed Leonard that he and other distributors were using materials received from Stemtech. Thereafter, Leonard contacted Stemtech's Chief Compliance Officer, Donna Serritella, requesting that Stemtech stop using his images. Serritella told Leonard that she thought that one of the images "was on the cover of a major publication, and that made it public for usage." J.A. 898.

Despite being on notice of Leonard's claim that Stemtech and its distributors were using his images without permission, Stemtech did not notify its distributors of his assertion, which it could have done via company-wide email, its weekly newsletter, or monthly communications. In fact, Leonard continued to discover and document unauthorized uses of his photographs on Stemtech-affiliated websites and in its materials. For example, in May 2008, Leonard's friend ordered a Stemtech sales kit from a distributor. The sales kit, intended for marketing the Stemtech product and training distributors, included DVDs with covers featuring one of Leonard's images, and videos of "The Stemtech Story" and "Stem Cells and Stem Enhance with Christian Drapeau," which also contained one of the images. J.A. 905-10, 161.

Leonard continued to take screenshots of the websites and infringing materials, connecting them to Stemtech via website addresses, Stemtech-branded materials such as videos and PowerPoint presentations, distributor ID numbers, and even references and links encouraging website visitors to join the Stemtech distribution team. Additionally, Leonard discovered his images on Stemtech's website system, stemtechbiz.com, which involved "websites that Stemtech owned and operated," as well as websites of individual distributors. J.A. 945-46.

## E. The Civil Suit

Leonard demanded that Stemtech and several of its distributors pay him for the unauthorized use of his images. When Stemtech refused, Leonard filed the instant action, alleging numerous claims of copyright infringement. Following discovery and motion practice, a jury trial commenced on Leonard's claims against Stemtech for direct, vicarious, and contributory infringement.[4] The jury heard testimony from Leonard, a Photo Researchers employee, and Stemtech officials and distributors.

In addition, the jury heard testimony from Leonard's damages expert, Jeffrey Sedlik. Sedlik estimated the fair market value of a license to use the images. To this end, he contacted two of the largest stock photo agencies and two agencies that specialize in scientific images to ascertain the

---

[4] Stemtech does not appeal the jury's verdict finding it liable for direct copyright infringement and Leonard does not appeal the order granting summary judgment to Stemtech on his claims for statutory damages and alleged infringement of other images.

9

fair market value of microscopic photography images when licensed for various forms of media comparable to those Stemtech used in its marketing materials. From the quotes provided by these agencies, he generated a benchmark licensing fee of between $1,277.10 and $2,569.46. He then applied the average of these fees to the 92 infringing uses identified at trial, which yielded a fee of $215,767.66.

Sedlik then adjusted this figure upward to account for the "scarcity or rarity" of Leonard's images. J.A. 1315-17. In other words, Sedlik attempted to capture "the market value of stem cell photographs in general, and then the scarcity or rarity of particular stem cell images, [which] is a factor that is considered in licensing."[5] J.A. 1313. Sedlik recommended a premium of three to five times the benchmark to reflect the scarcity of the images.[6] In addition, he adjusted the benchmark figure for "exclusivity," which accounts for "overuse or broad use" of an image, which diminishes the value of other uses, by adding a premium of 3.75 to 8.75 times the benchmark. J.A. 1317-19. After adding the adjustments together, he opined that the appropriate damages

---

[5] On the rarity point, Sedlik noted that "[s]tem cell [photographs] [are] not Sasquatch; however, every photographer, everybody in the industry that saw that 2006 cover of Time, that was kind of a turning point where people realized that microscopy can be an art form," J.A. 1313, and "in 2006 and before, there were fewer images available." J.A. 1314.

[6] Sedlik testified that the multipliers were not applied as punishment for Stemtech's unauthorized use of the images. J.A. 1307 (noting "in actual damages, the damages that [Sedlik] come[s] up with can't be of a kind that punish the defendant").

10

would range from $1.4 million to nearly $3 million. Stemtech neither cross-examined Sedlik about his use of these premiums nor presented its own expert, and asserted that Leonard's past licensing history supported an award of only $1,804.

The jury returned a $1.6 million verdict in Leonard's favor on his direct, vicarious, and contributory infringement claims against Stemtech. The District Court denied Stemtech's motion for a new trial on contributory and vicarious liability and damages.

In these cross appeals, we are asked to review whether the District Court abused its discretion in denying Stemtech's motion for a new trial by finding that the jury's contributory and vicarious infringement findings were supported by substantial evidence, and affirming the jury's damages award, which Stemtech contends is unconstitutionally and grossly excessive. We are also asked to review the District Court's ruling that Leonard's counsel's conduct and certain evidentiary rulings did not warrant a new trial. In addition, we are asked to consider whether the District Court abused its discretion in declining to award Leonard prejudgment interest, erred in not permitting the jury to consider awarding Leonard infringer's profits under 17 U.S.C. § 504(b), and correctly decided two fee awards.

II[7]

A. New Trial Standard

[7] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a), and 17 U.S.C. § 101, et seq. We have appellate jurisdiction under 28 U.S.C. § 1291.

11

We will first address Stemtech's appeal of the order denying it a new trial. While a court may grant a new trial under Rule 59 "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), it should do so only when "the great weight of the evidence cuts against the verdict and . . . [ ] a miscarriage of justice would result if the verdict were to stand," Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006) (internal quotation marks omitted); see Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1352-53 (3d Cir. 1991) (new trial should be granted only where the verdict "cries out to be overturned" or "shocks [the] conscience"). A district court's power to grant a new trial is limited "to ensure that [it] does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 201 (3d Cir. 1996) (internal quotation marks omitted). Our power is similarly limited and we review the grant or denial of a motion for a new trial for abuse of discretion. Olefins Trading, Inc. v. Han Yang Chem. Corp., 9 F.3d 282, 289 (3d Cir. 1993).

To demonstrate that the District Court erred in declining to grant it a new trial because the verdict was against the weight of the evidence, Stemtech must establish that (1) the jury reached an unreasonable result, and (2) the District Court abused its broad discretion in not setting the verdict aside. See ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 268 (3d Cir. 2012) (noting that while we exercise plenary review of "questions of law underlying a jury verdict," putting those questions aside, a "'jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have

12

rationally reached its verdict.'" (quoting <u>Swineford v. Snyder Cty.</u>, 15 F.3d 1258, 1265 (3d Cir. 1994))).

## B. Secondary Liability

Stemtech argues that a new trial is warranted because the jury's contributory and vicarious infringement findings are not supported by substantial evidence. Contributory and vicarious infringement are theories of secondary liability for copyright infringement that "emerged from common law principles and are well established in the law."[8] <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 930 (2005). "Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001). Thus, to prove a claim of contributory or vicarious infringement, a plaintiff must first show direct infringement by a third party. To prove direct infringement, a plaintiff must show that (1) it owns a valid copyright; (2) another party copied elements of its work without authorization; and (3) that party engaged in volitional conduct. <u>Kay Berry, Inc. v. Taylor Gifts, Inc.</u>, 421 F.3d 199, 203 (3d Cir. 2005); <u>CoStar Grp., Inc. v. LoopNet, Inc.</u>, 373

---

[8] While "the lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn," <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 930 n.9 (2005), "in general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement, while vicarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities." <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>, 508 F.3d 1146, 1175 (9th Cir. 2007).

F.3d 544, 551 (4th Cir. 2004). Volitional conduct occurs when a party engages in "the act constituting infringement." CoStar Group, 373 F.3d at 551 (distinguishing between internet entities that serve as conduits for transmission of copyrighted material and those who have an "interest in the copy itself").

Leonard proved direct infringement by Stemtech distributors. He demonstrated that he owned the copyrights to the infringed images, and that he did not authorize or license the use of his images in Stemtech's advertising, marketing, and training materials. The materials containing his images ranged from webpages and PDFs to videos and a PowerPoint presentation promoting Stemtech products.[9] This evidence provided a sufficient basis for a jury to reasonably conclude that the distributors directly infringed Leonard's copyrights.

Having determined that there was sufficient evidence to establish the predicate for secondary liability, we now turn to the claims against Stemtech for contributory and vicarious infringement.

### 1. Contributory Infringement

"One infringes contributorily by intentionally inducing or encouraging direct infringement." Grokster, 545 U.S. at 930. To establish a claim of contributory infringement, a plaintiff must show: (1) a third party directly infringed the

---

[9] Stemtech's argument that Leonard failed to prove that Photo Researchers, his licensing agent at the time, did not license the images to Stemtech and/or its distributors, is, as the District Court noted, an improper attempt to shift the burden of an unproven defense of authorization.

14

plaintiff's copyright; (2) the defendant knew that the third party was directly infringing; and (3) the defendant materially contributed to or induced the infringement. See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971) ("[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."); see also Perfect 10, 508 F.3d at 1171 (explaining that, "under Grokster, an actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in such direct infringement").

The District Court appropriately denied Stemtech's motion for a new trial on Leonard's contributory infringement claim. As discussed above, there was sufficient evidence from which a jury could conclude that third parties, namely Stemtech's distributors, directly infringed Leonard's copyrights. Furthermore, the evidence shows that Stemtech knew of the distributors' infringing activity. Stemtech itself created the materials containing Leonard's images, provided the materials to its distributors, and required the distributors to use the materials. Thus, Stemtech knew of its distributors' infringing activities and plainly took "steps that [we]re substantially certain to result in such direct infringement." Perfect 10, 508 F.3d at 1171-72.

We also note that the jury had a basis to conclude that Stemtech knew that the images it provided to its distributors were copyrighted. The jury heard evidence that Stemtech had negotiated with Leonard for a limited-use license of one of his images in the HealthSpan magazine. From this evidence, the jury could infer that, despite knowing that Leonard's images were copyrighted, Stemtech required its distributors to

15

use the images Leonard owned to promote Stemtech's products and thereby materially contributed to or induced their infringement.[10]

For these reasons, the District Court did not abuse its discretion in concluding that the jury's contributory infringement verdict in favor of Leonard was not against the weight of the evidence and hence properly denied Stemtech's motion for a new trial on Leonard's contributory infringement claim.

## 2. Vicarious Infringement

The District Court also correctly denied the motion for a new trial on Leonard's vicarious infringement claim. Vicarious infringement occurs when one "profit[s] from direct infringement while declining to exercise a right to stop or limit it." Grokster, 545 U.S. at 930. To establish vicarious infringement, a plaintiff must prove that the defendant had (1) the right and ability to supervise or control the infringing activity; and (2) a direct financial interest in such activities. Grokster, 545 U.S. at 930 & n.9; Am. Tel. and Tel. Co. v. Winback and Conserve Program, 42 F.3d 1421, 1441 (3d Cir. 1994) (reciting similar standard).

The requirement that a defendant have the right to supervise or control is not limited to traditional agency

---

[10] Stemtech's sole defense to its use was its compliance officer's belief that the image was in the public domain because it appeared on the cover of Time. Even if her ignorance of the law were excusable, the fact that Stemtech entered into negotiations for a limited use of the images belies such ignorance.

16

relationships such as master-servant or employer-employee. Indeed, vicarious infringement liability has been imposed on a person or entity "even in the absence of an employer-employee relationship . . . if [the person or entity] has the right and ability to supervise the infringing activity." Gershwin, 443 F.2d at 1162; Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304, 308 (2d Cir. 1963); see Napster, 239 F.3d at 1022 (affirming extension, in copyright context, of vicarious liability beyond employer-employee relationship); see also Winback and Conserve Program, 42 F.3d at 1441 (citing Gershwin and Shapiro, Bernstein). Nor does the control element require the existence of a formal contract between the defendant and the infringer. Rather, this element is satisfied where a "defendant's 'pervasive participation in the formation and direction' of the direct infringer['s]" activity supports a finding that "defendants were in a position to police the direct infringers." Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 262-63 (9th Cir. 1996) (defendant flea market operator had right to exclude vendors and "controlled and patrolled" the premises) (quoting Gershwin, 443 F.2d at 1163)); see Gershwin, 443 F.2d at 1163 (imposing vicarious liability even where defendant lacked contractual ability to control direct infringer); Shapiro, Bernstein, 316 F.2d at 306 (imposing vicarious liability where parties had licensing agreement).

Cases from other circuits provide examples of conduct sufficient to demonstrate control. In Shapiro, Bernstein, for example, the Court of Appeals for the Second Circuit held a chain store company liable for the sale of infringing bootleg records by its licensee, who operated "the phonograph record department in . . . its stores," because the company "retained the ultimate right of supervision over the conduct of the record concession and its employees." 316 F.2d at 306, 308.

17

The court compared the situation to the numerous cases holding a "dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income[,] . . . whether the bandleader is considered, as a technical matter, an employee or an independent contractor." Id. at 307 (collecting cases).  In Napster, the Court of Appeals for the Ninth Circuit observed that the defendant, a file sharing program operator, "ha[d] the ability to locate infringing material listed on its search indices, and the right to terminate users' access to the system."  239 F.3d at 1024.  At the other end of the "spectrum" is the example of a landlord-tenant case in which a "landlord leas[es] his property at a fixed rental to a tenant who engages in copyright-infringing conduct on the leased premises" and who generally does not have an obligation to police infringing conduct.  Shapiro, Bernstein, 316 F.2d at 307-08.

Like the chain store, dance-hall proprietor, and file-sharing program operator, Stemtech had the right and ability to control the infringing activities of its distributors. Stemtech created and provided marketing materials to its distributors, and required their use.  It also had the contractual right to impose a range of disciplinary sanctions on distributors who violated its policies or engaged in illegal behavior, ranging from withholding compensation to terminating a distributorship agreement.  Additionally, Stemtech required its distributors to use "official STEMTech replicated templates" and websites that it controlled.  J.A. 2139.  To the extent infringements occurred on what Stemtech asserts were unauthorized, independent websites, Stemtech still had the ability to induce compliance by distributors operating these websites by withholding

18

compensation and access to back office support.[11]  Stemtech thus had the "practical ability to police the third-party [distributors'] infringing conduct."  Perfect 10, 508 F.3d at 1174.  The evidence of this contractual and financial relationship between Stemtech and its distributors provided a basis for the jury to conclude that Leonard satisfied the right and ability to supervise or control element.

Besides demonstrating control, a plaintiff must also show financial benefit to the defendant to prevail on a vicarious infringement claim.  Shapiro, Bernstein, 316 F.2d at 307 (courts should consider the interplay between the two elements).  "Financial benefit exists where the availability of infringing material acts as a draw for customers."  Ellison v. Robertson, 357 F.3d 1072, 1078, 1079 (9th Cir. 2004) (internal quotation marks omitted).  "There is no requirement that the draw be substantial."  Id. (internal quotation marks omitted).

The jury could reasonably have credited the testimony from Stemtech officials indicating that images of stem cells lend legitimacy to products that purportedly enhance stem cell production and from this infer that the images could have drawn customers to buy the product, which would financially benefit Stemtech.  Thus, there was sufficient evidence from which the jury could find that the financial benefit element was met.  Because the verdict was not against the weight of the evidence, the District Court did not abuse its discretion in denying Stemtech's motion for a new trial on Leonard's vicarious infringement claim.

---

[11] Stemtech's ability to control its distributors is further reflected by the fact that when it asked a distributor to stop using the images, the distributor complied.

19

C.  Damages

1.  The Jury Award

Stemtech argues that the jury's $1.6 million actual damages award was unconstitutionally and grossly excessive, and therefore should be reduced or vacated and remanded for a new damages trial.  We will first discuss the methods for calculating actual damages under the Copyright Act, then review the District Court's decision to permit Leonard's damages expert to testify, and finally examine whether the award here was unconstitutionally or grossly excessive.

a.  Actual Damages under § 504(b)

Section 504 of the Copyright Act authorizes recovery of "the actual damages suffered by [the copyright owner] as a result of the infringement."  17 U.S.C. § 504(b).  Although the Act does not define "actual damages," our sister circuits have explained that an actual damages award "looks at the facts from the point of view of the[] copyright owners; it undertakes to compensate the owner for any harm he suffered by reason of the infringer's illegal act."  On Davis v. The Gap, Inc., 246 F.3d 152, 159 (2d Cir. 2001).  These damages "are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer."  McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 566 (7th Cir. 2003); see Fitzgerald Publ'g Co. v. Baylor Publ'g Co., 807 F.2d 1110, 1118 (2d Cir. 1986) ("[T]he primary measure of recovery is the extent to which the market value of the copyrighted work at the time of the infringement has been injured or destroyed by the

20

infringement.") (citing 3 Nimmer on Copyright § 14.02 at 14-6); Dash v. Mayweather, 731 F.3d 303, 312 (4th Cir. 2013) (quoting Fitzgerald, supra).  Because the Act "should be broadly construed to favor victims of infringement," On Davis, 246 F.3d at 164, "uncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement," 4 Nimmer on Copyright § 14.02[A], at 12-14; see, e.g., On Davis, 246 F.3d at 166 (explaining that the jury's calculation of actual damages may not be based on "undue speculation" (internal quotation marks omitted)); Sygma Photo News, Inc. v. High Soc. Magazine, Inc., 778 F.2d 89, 95 (2d Cir. 1985) ("Confronted with imprecision in the computation of expenses, the court should err on the side of guaranteeing the plaintiff a full recovery.").  Some uncertainty stems from the fact that the Copyright Act does not specify how damages should be calculated.  See Mayweather, 731 F.3d at 312.  Case law, however, describes the permissible methods for determining damages.

One method involves calculating the fair market value of the licensing fees "the owner was entitled to charge for such use."  On Davis, 246 F.3d at 165 (explaining that "[i]f a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner . . . the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for").  Fair market value is often described as "the reasonable licensing fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer."  Id. at 167; see Jarvis v. K2 Inc., 486 F.3d 526, 534 (9th Cir. 2007) (applying standard); Mackie v. Rieser, 296 F.3d 909, 917 (9th Cir. 2002) (noting that the "market value approach is an objective,

not a subjective, analysis"). Another method for calculating damages focuses on the plaintiff's own past licensing fees. See, e.g., Jarvis, 486 F.3d at 534 (noting district court calculated damages using plaintiff's past license). Stemtech asks us to use the past licensing fee method but cites no authority requiring the use of this method as opposed to the fair market value approach, and case law on this subject supports using the fair market value. See On Davis, 246 F.3d at 166 ("The question is not what the owner would have charged, but rather what is the fair market value."); Mayweather, 731 F.3d at 312 (describing both calculation methods and noting "general[ ] accept[ance]" of fair market value approach). Because the jury was instructed about both methods for determining actual damages, and had an evidentiary basis for applying the fair market value through Sedlik's expert testimony, there was no error in allowing the jury to consider evidence about damages based on the fair market value approach.

### b. Admission of Sedlik's Expert Opinion

Stemtech challenges the denial of its Daubert motion to exclude Sedlik's testimony on various grounds, including, as relevant here, the basis for his opinions. In denying the motion, the District Court determined that Sedlik's method for calculating Leonard's actual damages using fair market value, as opposed to Leonard's past licensing history, was reliable, as there is no requirement that actual damages be calculated based on a plaintiff's own history of licensing fees. It also concluded that Sedlik had a factual basis for his calculation based upon the quotes he received for other photographs. Finally, the District Court concluded that there was a fit between the facts of the case and Sedlik's damages calculation, and that challenges to the fit and reliability of the

22

fair market value method could be pursued via cross-examination.[12]

Stemtech argues that the District Court erred in denying its <u>Daubert</u> motion, claiming that Leonard failed to lay a foundation for Sedlik's lump sum damages figure because Sedlik's testimony revealed "he relied on unverified information from Leonard's counsel and did not make an independent determination of usages or infringements or calculate separate fees for the 92 alleged infringements." Appellant's Br. 57 (citing J.A. 1304-05, 1307-09, 1310-11, 1316, 1320). We review the admission or exclusion of expert testimony for abuse of discretion. <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 243 (3d Cir. 2008). "It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." <u>Stecyk v. Bell Helicopter Textron, Inc.</u>, 295 F.3d 408, 414 (3d Cir. 2002).

Sedlik adopted the recognized fair market value approach for calculating damages. To enable him to estimate the fair market value, he collected quotes from Getty Images and other photo licensing agencies and obtained a range of licensing fees for various uses similar to those involved in the case, averaged them, and then applied the average to the 92 alleged instances of infringement. Stemtech's disagreement with the calculation methodology and the underlying assumptions Sedlik made about which images and uses were similar to those in this case goes to the weight given to his testimony, rather than admissibility. <u>See</u> <u>Breidor v. Sears,</u>

---

[12] We note that Stemtech failed to file objections to the Magistrate Judge's memorandum order denying Stemtech's <u>Daubert</u> motion.

23

Roebuck & Co., 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."). Thus, the District Court appropriately denied the Daubert motion, and the jury was properly permitted to consider Sedlik's testimony about damages.

c. Excessiveness

Because we are deferential to a jury's damages verdict, that verdict may be disturbed only if it is so grossly excessive that it shocks the judicial conscience, William A. Graham Co. v. Haughey, 646 F.3d 138, 142 (3d Cir. 2011) (Graham II), or if it is unconstitutionally excessive because it is predicated on an impermissible basis, Cortez v. Trans Union, LLC, 617 F.3d 688, 715-18 (3d Cir. 2010). With respect to a claim that a damage award is grossly excessive, our review is "exceedingly narrow" and our "responsibility [is] to review a damage award to determine if it is rationally based." Id. at 718. This standard "exists to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury," and is "even more pressing at the appellate level, where the judges have not had the opportunity to observe the trial." Graham II, 646 F.3d at 143 (internal quotation marks omitted). Thus, although we view the facts "in the light most favorable to" the defendant, Cortez, 617 F.3d at 719, "[a] jury's damages award will not be upset so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award," Thabault v. Chait, 541 F.3d 512, 532 (3d Cir. 2008). If a court determines that "the amount of the award is inconsistent with the evidence in a case," it "must offer a new trial as a[] [conditional] alternative to a reduction in the award

24

in order to avoid depriving the plaintiff of his/her Seventh Amendment right to a jury trial." Cortez, 617 F.3d at 716.

Of course, the award must also be consistent with the governing law. The Copyright Act sets forth the available damages for a prevailing plaintiff. Stemtech correctly notes that the Act does not authorize recovery of punitive damages. See 17 U.S.C. § 504. Stemtech, however, wrongly asserts that the $1.6 million award includes punitive damages. To understand why, we will examine Sedlik's expert damages opinion.

As recounted above, Leonard's expert, Sedlik, surveyed four stock photo agencies to obtain image licensing rates for uses similar to the infringing uses, and averaged the quotes to arrive at a per-use licensing fee of between $1,277.10 and $2,569.46. These fees factored in the image size, form of media, size of audience, geographical scope, placement, number of appearances, and length of the license. Sedlik selected a figure within this range, multiplied it by the 92 infringements presented at trial, and arrived at a "benchmark" fair market value calculation of $215,767.65.

In Sedlik's opinion, this figure did not account for scarcity—the rarity of stem cell images—or exclusivity—that is, how Stemtech's extensive use would be akin to an exclusive license that would eliminate or reduce licensing revenue from other sources and/or decrease the value of Leonard's work. Sedlik testified that a "premium" or multiplier of three to five times the benchmark figure was warranted to account for the scarcity, and a multiplier of 3.75 to 8.75 times the benchmark was appropriate to account for the exclusivity of Leonard's images during the infringement period, which yielded a total estimated range of actual

25

damages of approximately $1.4 million to nearly $3 million. In addition to explaining that the benchmark figure needed to be enhanced because it did not capture the rarity or exclusivity of Leonard's images, Sedlik informed the jury that "the damages that [he] come[s] up with can't be of a kind that punish[es] the defendant." J.A. 1307.

Despite this comment, Stemtech claims the multipliers Sedlik applied are actually an impermissible penalty "akin to punitive damages, which are not recoverable under § 504(b) of the Copyright Act."[13] Grant Heilman Photography, 115 F. Supp. 3d at 527. In response, Leonard argues that these multipliers are not punitive but rather comprise elements of the fair market value of his images, and that the $215,767

---

[13] In our view, there is a question as to whether Stemtech waived its challenge to Leonard's use of a multiplier as part of his damages proof. Sedlik disclosed his reliance on a multiplier for scarcity and mentioned exclusivity as an additional relevant factor in his report, but Stemtech never challenged either factor in its Daubert motion. Moreover, it did not cross-examine Sedlik at trial on this topic and raised the multiplier issue for the first time in its motion for a new trial. Leonard, however, does not argue waiver, so he arguably "waived" his right to oppose Stemtech's challenge to the jury award on this basis. See Freeman v. Pittsburgh Glass Works, LLC, 709 F.3d 240, 250 (3d Cir. 2013) ("The doctrine of appellate waiver is not somehow exempt from itself. This means that a party can waive a waiver argument by not making the argument below or in its briefs." (internal citation omitted)). Because the District Court had an opportunity to address the issue, and Leonard has not asserted waiver, we will address Stemtech's challenge to Leonard's use of a multiplier for scarcity and exclusivity.

benchmark was not the complete fair market value sum because Sedlik had not yet accounted for scarcity and exclusivity.

The few district courts to consider the use of punitive multipliers have concluded that such use is improper under the Copyright Act because "[t]he value of what was illegally taken is not determined by multiplying it." Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc., 335 F. Supp. 2d 466, 469 (S.D.N.Y. 2004) (internal quotation marks omitted); Grant Heilman Photography, 115 F. Supp. 3d at 526-27; Faulkner v. Nat'l Geographic Soc'y, 576 F. Supp. 2d 609, 617 (S.D.N.Y. 2008) (rejecting use of punitive multiplier for unauthorized use to calculate "actual damages" under § 504(b)); Straus v. DVC Worldwide, Inc., 484 F. Supp. 2d 620, 648-49 (S.D. Tex. 2007) (crediting testimony of defendant's expert Jeff Sedlik, who stated that "multipliers are used only when the parties include them in licensing agreements and are enforced as part of the contract," but "are not used to determine the fair market value of a license at the time infringement occurs," and noting that use of a multiplier would be punitive in that case).[14]  These courts rejected the use of a multiplier or "'fee for unauthorized usage'" over and above what "would otherwise represent a fair and reasonable licensing fee for the infringed material" as a component of the actual damages calculation. Stehrenberger, 335 F. Supp. 2d at 467.  We agree with the reasoning of these district courts that, under the Copyright Act, an actual damages award may not include such a punitive component.  We also agree with

---

[14] Cf. Bruce v. Weekly World News, Inc., 310 F.3d 25, 27 n.1 (1st Cir. 2002) (permitting multiplier for unauthorized use in a § 504(b) case where the parties agreed on the use of a multiplier).

27

Leonard that this case does not involve the use of a multiplier to penalize unauthorized use. Rather, the record demonstrates that the multiplier here was used to calculate fair market value.

The jury had sufficient evidence to credit Sedlik's opinion and conclude that the sum calculated from the stock photo agency rates did not represent a full calculation of the fair market value of Leonard's images because the rates did not account for scarcity and exclusivity. Put differently, Sedlik's fair market value calculation in this case had two components: the stock agency quotes and the adjustments to reflect the uniqueness of the images and the impact of Stemtech's usage. The multipliers here reflected a premium that, according to Sedlik, the market would find acceptable given the scarcity and exclusivity of the images as compared to the images for which he had secured rates for comparative purposes. The unrebutted evidence here showed that the fair market value calculation was complete only after these additional factors were applied.

Since Stemtech presented no evidence or methodology to cast doubt on the use of multipliers to account for factors relevant to a final fair market value, neither the District Court nor the jury had any basis to discount this aspect of Sedlik's testimony. Because there is no evidence that the scarcity and exclusivity multipliers were punitive rather than valid factors for calculating fair market value, we cannot say that the verdict is based upon an improper consideration.[15]

---

[15] Stemtech also argues that the jury award was unconstitutionally excessive under the Due Process Clause. Ordinarily, Due Process challenges are appropriately directed at punitive damages awards, which are intended to punish

28

Nor is the verdict grossly excessive. As noted above, courts are loath to substitute their judgment for that of the jury. While the award here was quite high, and perhaps surprising, we cannot say it lacked an evidentiary basis such that it "shock[s] the judicial conscience." Graham II, 646 F.3d at 143. The jury heard unrebutted expert testimony that provided it with the basis for the fair market value assigned to the images, which included both a benchmark for similar but less unique images and a range for a premium to reflect the rarity of Leonard's image and its unusually widespread use in Stemtech's materials. Sedlik provided a multiplier of three to five times the benchmark for scarcity and 3.75 to 8.75 times for exclusivity, and opined that the fair market value for use of the images would be determined by multiplying these figures by the benchmark sum of $215,767.65. The jury returned a verdict of $1.6 million, which represents a final sum at the lower end of Sedlik's proposed range.

The damages award was tethered to the record, which the jury was entitled to credit, and the jury was presented with no evidence that provided an alternative calculation. See Thabault, 541 F.3d at 532-33 (reviewing testimony of

defendants, rather than at compensatory damages awards, which are simply intended to redress a plaintiff's loss. See Cooper Indus. v. Leatherman Toll Grp., Inc., 532 U.S. 424, 432 (2001) (discussing distinction between punitive and compensatory awards for Due Process purposes); United States ex rel. Drakeford v. Tuomey, 792 F.3d 364, 387 (4th Cir. 2015) ("[T]he Due Process Clause does not apply to compensatory damage awards."). Here, our conclusion that the damages award did not include a punitive component is fatal to Stemtech's constitutional excessiveness claim.

damages expert, noting defendant's attempts to discredit expert at trial, and concluding that "it is clear that if the jury accepted his calculation there was sufficient evidence to sustain [the award] as detailed by his testimony"). In light of our deferential standard of review, we conclude that the District Court did not abuse its discretion in denying a new trial on the basis of a grossly excessive jury verdict.

## 2. Infringer's Profits

In addition to authorizing recovery of actual damages, the Copyright Act allows a plaintiff to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). These are "profits earned not by selling an infringing product, but rather earned from the infringer's operations that were enhanced by the infringement."[16] William A. Graham Co. v. Haughey, 568 F.3d 425, 442 (3d Cir. 2009) (Graham I). Under the Act, to "establish[] the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Though the Act

---

[16] Direct profits may also constitute infringer's profits where, for example, a defendant sells an infringing product. To the extent Leonard claims that the District Court failed to consider his evidence of direct profits from Stemtech's sale of DVDs containing his images, this claim is waived as he conceded in his opposition to Stemtech's summary judgment motion that he was not seeking such direct profits. Moreover, Leonard presented no evidence of any profits Stemtech made from DVD sales.

requires a copyright owner to present proof of the infringer's "gross revenue" to support its initial burden, courts interpret the term to mean the gross revenue that is "reasonably related to the infringement." Graham I, 568 F.3d at 443 (quoting On Davis, 246 F.3d at 160); see Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 711-12 (9th Cir. 2004) (noting it would "make little practical or legal sense" to conclude a plaintiff satisfies his burden simply by "offer[ing] an overall gross revenue number . . . and sit[ting] back"); Taylor v. Meirick, 712 F.2d 1112, 1122 (7th Cir. 1983) ("If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.").

Under § 504(b), we use a "'two-step framework for recovery of indirect profits." Graham I, 568 F.3d at 442. First, the plaintiff must demonstrate a "causal nexus between the infringement and the [infringer's] gross revenue," or put differently, show that the infringement contributed to the infringer's profits. Id. (alteration in original). Second, "once the ca[usal] nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement" and may adduce evidence of offsets permitted by the statute. Id. (internal quotation marks and citation omitted)

The District Court granted Stemtech's motion for summary judgment on Leonard's request for infringer's profits, concluding that the evidence he presented was too speculative for a jury to find that he was entitled to infringer's

31

profits.[17]   To support his request for infringer's profits, Leonard submitted proof of Stemtech's total gross revenues. In addition, Leonard pointed to: (1) the regular use of his images in Stemtech marketing and training materials; (2) the requirement that Stemtech distributors use Stemtech's replicated websites and marketing materials; and (3) his expert's conclusion that "Stemtech's many usages of Leonard's photographs conclusively demonstrates that Stemtech exploited Leonard's photograph[s] to promote its brand, to promote understanding of its company and products, to train and recruit distributors and to provide those distributors with tools which were used to maximize Stemtech's profits."  J.A. 336 (internal quotation marks and emphasis omitted).

None of this evidence shows how or why Leonard's images, as opposed to other aspects of Stemtech's marketing materials, influenced profits.  As the District Court correctly found, this evidence did not "link customer decisions to purchase [Stemtech]'s product with [Stemtech]'s use of his [i]mages on its website, or in its videos, HealthSpan publication or other marketing materials, as opposed to any other reason why a customer might purchase those products."  J.A. 337.  We agree with these observations and with the conclusion that, while "it is conceivable that the presence of the [i]mages in [Stemtech]'s materials added an air of

---

[17] We review the District Court's grant of summary judgment de novo, Alcoa, Inc. v. United States, 509 F.3d 173, 175 (3d Cir. 2007), applying the same standard as the District Court and viewing facts and making reasonable inferences in the non-movant's favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005).

legitimacy to [Stemtech]'s product that might not have otherwise existed, and that the [i]mages could possibly have had some impact, whether consciously or subconsciously, on consumer purchasing decisions . . . [m]ere conceivability . . . is not enough. Instead, Plaintiff must identify evidence showing that the infringing use was 'reasonably related to the infringement,'" and the evidence cited above amounted to mere speculation regarding the causal connection.[18] J.A. 334.

---

[18] For examples discussing infringer's profits, see Mackie, 296 F.3d at 916 (insufficient evidence of causal nexus between "the Symphony's infringing use of [artwork called] 'The Tango' and any Pops series revenues generated through the inclusion of the collage in the direct-mail literature," in part due to the "virtually endless permutations to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question"); cf. Graham I, 568 F.3d at 442 (sufficient evidence of causal nexus in a case where the copyrighted materials were sample insurance proposals, and where plaintiff's expert "identified client proposals issued by USI that included infringing language and then calculated the revenues obtained by USI from those clients [who had received] infringing proposal[s]" and USI personnel testified "that the written proposals . . . were an important part of the sales process . . . that . . . convinced [some clients] to purchase insurance through USI"); Polar Bear Prods., 384 F.3d at 700, 712 (sufficient evidence of causal nexus where expert calculated revenue from trade shows at which Timex used unauthorized "PaddleQuest" materials to promote its Expedition line of watches to outdoor sports enthusiasts, including a continuous-loop extreme-kayaking film produced by plaintiff, where expert "concluded that approximately 10% to 25% of trade show sales are the result of excitement

There was no evidence upon which a reasonable juror could have calculated infringer's profits. Because none of Leonard's evidence "create[d] a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement," Mackie, 296 F.3d at 911, we will affirm the District Court's order granting summary judgment in Stemtech's favor on Leonard's request for infringer's profits.

## 3. Prejudgment Interest

Leonard argues that the District Court abused its discretion in denying his motion for prejudgment interest. An award of actual damages under the Copyright Act alone "does not mitigate harm caused by delay in making reparations—a harm the remedy of prejudgment interest is uniquely tailored to address. Simply put, prejudgment interest is a different remedy for a different harm." Polar Bear Prods., 384 F.3d at 718 (cited with approval in Graham II, 646 F.3d at 144-45). Prejudgment interest "mak[es] the claimant whole and prevent[s] unjust enrichment." Graham II, 646 F.3d at 145. As we noted in Graham II, we "favor[ ] permitting prejudgment interest awards" to make a plaintiff whole in copyright cases, id. at 144 (emphasis omitted), because "as between a copyright owner and an infringer, the former has the stronger equitable claim to the time-value of income

---

created by the booth promotion, of which the . . . materials were a substantial part"); Andreas v. Volkswagen of Am., Inc., 336 F.3d 789, 791-97 (8th Cir. 2003) (sufficient nexus between Audi's use of a copyrighted poem in a commercial and profits from the ad campaign, where evidence showed that the "infringement was the centerpiece of [the] commercial").

derived from his creation," id. at 145; see Booker v. Taylor Milk Co., 64 F.3d 860, 868 (3d Cir. 1995) (describing general presumption in favor of prejudgment interest awards). For this reason, our Court subscribes to "our usual rule," Graham II, 646 F.3d at 145, that "a monetary award does not fully compensate for injury unless it includes an interest component," Kansas v. Colorado, 533 U.S. 1, 10 (2001).

Accordingly, "prejudgment interest is available in copyright cases at the District Court's discretion, exercised in light of 'considerations of fairness.'" Graham II, 646 F.3d at 145-46 (affirming District Court's grant of nearly $5 million in prejudgment interest) (quoting Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 274 (3d Cir. 2010)). In Booker, our Court ruled that it is an abuse of discretion for a district court to deny an award for prejudgment interest based on the conclusion that the actual damages award "alone wholly compensated Plaintiff, and that, because Plaintiff's conduct contributed to an inflated [damages] claim, the equities weighed against prejudgment interest." 64 F.3d at 868-69 (emphasis in original) (awarding prejudgment interest on a back pay award). A district court "may exercise its discretion to depart from th[e] presumption [of awarding interest] only when it provides a justification that reasonably supports the departure." Id. at 868. In other words, "[i]f prejudgment interest is denied, the District Court must explain why the usual equities in favor of such interest are not applicable." Pignataro, 593 F.3d at 274.

The District Court here denied prejudgment interest, explaining that it viewed such an award in this case as "inequitable and unfair" because the verdict "sufficiently compensated" Leonard "for the misappropriated value of his property" and "the award of interest would constitute a

35

windfall to Leonard." J.A. 1737-38 (internal quotation marks omitted). In this regard, the District Court observed that the verdict represented a per-use licensing fee far greater than the per-use fees Leonard previously received for use of the infringed images. It also noted that awarding "sums on top of the $1.6 million already awarded is not necessary to ensure that . . . [Stemtech] is adequately deterred," J.A. 1739, and emphasized that there was no jury finding of willful conduct on Stemtech's part. As an additional ground for denying prejudgment interest, the District Court cited the difficulty of calculating the "appropriate amount" of interest due to numerous infringements. J.A. 1739.

As in Booker, the District Court here was concerned with the high jury award and denied Leonard's motion for prejudgment interest because it deemed the $1.6 million actual damages award sufficient to compensate him. However, prejudgment interest serves a different purpose and Leonard was "entitled" to recompense "for the loss of the use of the amount" of actual damages. Booker, 64 F.3d at 869; see Graham II, 646 F.3d at 145 (emphasizing that "recoup[ment] [of] the time-value of [a plaintiff's] loss . . . is not . . . confined to the provision of just compensation," but also prevents a "losing defendant" from "retain[ing] . . . a windfall in the form of an interest-free loan"). Therefore, denying prejudgment interest on the ground that the damages award sufficiently compensated Leonard constitutes legal error.

Moreover, while we are not unmindful of the challenges related to calculating prejudgment interest in this case, with the 92 separate infringements that occurred on different dates, difficulty in calculating prejudgment interest is generally not a basis to deny an interest award. See, e.g.,

36

Hutchison v. Amateur Elec. Supply, Inc., 42 F.3d 1037, 1047 (7th Cir. 1994) (holding that "uncertainty" in calculating prejudgment interest does not "defeat the presumption in favor of prejudgment interest" and "[i]t is not within the district court's discretion to deny the whole award of interest because of . . . calculational ambiguities"); Williamson v. Handy Button Mach. Co., 817 F.2d 1290, 1299 (7th Cir. 1987) ("No purpose would be served by allowing the wrongdoer to keep the entire time value of the money, just because the exact amount is subject to fair dispute. Once we know that [damages are] at least some minimum, it is safe to award interest on that amount."). We note that a prevailing party moving for an award of prejudgment interest must provide the district court with sufficient information to calculate the interest or inform the court of the evidence it needs (such as information within the other party's control) to make its application. Where a prevailing party fails to provide the district court with this information, such an award may be denied.[19]

---

[19] An award may also be denied if the prevailing party engages in dilatory tactics during litigation or unnecessarily protracts the proceedings. Cf. City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 196 (1995) (citing "undue delay" as "the most obvious example" justifying the denial of prejudgment interest (internal quotation marks omitted)); Gen. Motors Corp. v. Devex Corp., 461 U.S. 648, 656-57 (explaining that in the patent infringement context, "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit"). Consistent with Devex, we note that "[t]here may be other circumstances in which it may be appropriate not to award

37

Here, the District Court stated that Leonard did not adequately address Stemtech's assertion that the interest should be calculated based on "perhaps 92 different accrual dates and interest rates." J.A. 1739. However, Leonard in fact offered to provide information on this topic if the Court deemed his proposed approach to use a single infringement date inadequate. Thus, Leonard was apparently ready to provide the information, including the dates on which he discovered each infringement. The District Court seems to have overlooked this offer, and therefore its views about the difficulty in calculation may have been misplaced.

Because the District Court denied prejudgment interest based upon its view that Leonard was sufficiently compensated, its order "rest[ed] upon . . . errant conclusion[s] of law." Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008). Moreover, because it found that calculating the interest was too difficult without fully considering the material Leonard was prepared to provide, its order rested on an erroneous finding of fact. We therefore will vacate the order denying an award of prejudgment interest and remand for the District Court to award prejudgment interest in the amount it deems appropriate under the governing law.[20]

_____

prejudgment interest," but "[w]e need not delineate those circumstances in this case." 461 U.S. at 657.

[20] The District Court has discretion in selecting the appropriate interest rate and date(s) of infringement from which the interest begins to accrue. See Graham II, 646 F.3d at 146-51 (holding that prejudgment interest "may be awarded in appropriate cases from the initial accrual date" but leaving open the possibility that other cases may warrant

38

## D. Trial Issues

Stemtech also asserts that it is entitled to a new trial based upon alleged improper conduct by Leonard's counsel and the erroneous admission of certain evidence. We will address these contentions in turn.

### 1. Counsel's Conduct

Stemtech complains that Leonard's counsel made comments during the trial that so prejudiced the jury that the District Court should have granted a new trial. Counsel's conduct "constitutes reversible error" only where he or she engaged in "argument injecting prejudicial extraneous evidence," Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 210 (3d Cir. 1992), such that the "improper statements . . . so pervade[d] the trial as to render the verdict a product of prejudice," Draper v. Airco, Inc., 580 F.2d 91, 96 (3d Cir. 1978). "Because the trial judge was present and able to judge the impact of counsel's remarks, we defer to his assessment of the prejudicial impact." Fineman, 980 F.2d at 207; Draper, 580 F.2d at 94 (recognizing that the trial judge has "considerable discretion in determining whether conduct by counsel is so prejudicial as to require a new trial"). We thus review the decision to grant or deny a motion for a new trial based upon counsel's conduct for abuse of discretion. Fineman, 980 F.2d at 206.

alternate approaches); see also Kansas, 533 U.S. at 11 (concluding special master did not err in determining that "considerations of fairness . . . supported the award of at least some prejudgment interest" (emphasis added) (internal quotation marks omitted)).

39

Stemtech first argues that Leonard's counsel "repeatedly referred to Stemtech as an international, multinational or global corporation" to highlight the financial disparity between Leonard and Stemtech. Appellant's Br. 45 (emphasis omitted). Contrary to Stemtech's assertions, reference to Stemtech's international status was not a prominent "theme" throughout the trial, and thus even if improper, these isolated references do not constitute "argument injecting prejudicial extraneous evidence."[21] Fineman, 980 F.2d at 210.

Stemtech next argues that Leonard's counsel used the wrong damages standard in his closing statement, but it did not object to these arguments during closing, and so the argument is waived.[22] See Dunn v. HOVIC, 1 F.3d 1371, 1377 (3d Cir. 1993) (failure to make timely objection to statements of counsel during closing argument is a waiver to challenging them on appeal).

---

[21] Similarly, Stemtech's claim that Leonard's counsel improperly insinuated that the company operated as a pyramid scheme is not a basis for a new trial. Not only were these references sporadic, but they also accurately describe Stemtech's top-down business structure. In any event, the "pyramid" references do not make it "reasonably probable" that the jury's verdict was influenced by these statements, Fineman, 980 F.2d at 207, and therefore do not warrant a new trial.

[22] To the extent Stemtech's arguments on this point merely repeat its attack on Sedlik's expert testimony, such arguments fail as we have determined that his testimony was properly admitted.

Finally, Stemtech complains of "occasions that [Leonard's counsel] argued unsupported issues[, which] are too numerous to discuss." Appellant's Br. 53. This broad statement does not suffice to preserve a claim of error on appeal. See Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A), 768 F.3d 284, 292 n.3 (3d Cir. 2014) (discussing an issue in a single sentence may result in waiver); Long Hao Li v. Att'y Gen., 633 F.3d 136, 140 n.3 (3d Cir. 2011) ("stray references" result in waiver); John Wyeth & Brother Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (raising an issue "in passing" without "squarely argu[ing it]" results in waiver).[23]

To the extent Stemtech has provided any details concerning such alleged misconduct, none provides a basis for granting a new trial. Stemtech's contention that Leonard's counsel improperly argued that Stemtech profited from the infringements "despite the absence of any such evidence," Appellant's Br. 54, is meritless because there was sufficient evidence to permit counsel to argue that Stemtech profited from the use of the images, including the testimony

---

[23] Similarly, Stemtech's argument that a new trial is warranted due to counsel's "additional unsupported and improper statements and arguments," Appellant's Br. 55 (capitalization omitted), that amounted to "pleas of pure passion . . . [and] blatant appeals to bias and prejudice," Draper, 580 F.2d at 95, has been waived. Stemtech did not object to any of the summation statements it claims were directed to bias and passion. See Dunn, 1 F.3d at 1377. Even if Stemtech had preserved these claims of error, "at least for civil trials, improper comments during closing arguments rarely rise to the level of reversible error." Id. (quotation marks, citation, and alteration omitted).

from Stemtech employees that depicting stem cells was important to selling products that purportedly enhanced stem cell production.

Stemtech's assertion that Leonard's counsel improperly argued that the evidence of infringement presented at trial was "only the tip of the iceberg" also does not provide a basis for a new trial. According to Stemtech, Leonard, his counsel, and Sedlik each used language at the trial that suggested that there were likely additional acts of infringement by Stemtech and its distributors that were not presented at trial. To the extent Stemtech makes claims about what Leonard and Sedlik said during their testimony, this is not conduct of counsel and is irrelevant. To the extent Stemtech complains about counsel's use of the phrase during his argument, such a stray remark does not make it "reasonably probable" that the verdict was influenced by these statements and thus does not warrant a new trial. Fineman, 980 F.2d at 207.[24]

[24] The District Court excluded as speculative Sedlik's opinion that the 92 infringing examples that would be presented at trial were only the "tip of the iceberg." J.A. 638-40 (order granting motion in limine in part and barring "tip of the iceberg" statement and opinion regarding licensing fees for images not at issue in the case). To the extent Stemtech argues Sedlik's testimony that "looking for usages on the internet is . . . an endless field of haystacks" violated this ruling, Stemtech objected and the District Court sustained the objection. J.A. 1381. Moreover, the District Court instructed the jury at the outset of trial that it should disregard evidence to which an objection was lodged when the objection is sustained, J.A. 766 ("If [an] objection is sustained, ignore the question."), and jurors are presumed "to follow their

42

For these reasons, the District Court did not abuse its discretion in determining that none of Leonard's counsel's conduct warrants a new trial.

## 2. Evidentiary Rulings

The final basis for Stemtech's motion for a new trial is that the District Court erred in admitting certain evidence. Under Fed. R. Evid. 103 and Fed. R. Civ. P. 61, "a finding of reversible error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Becker v. ARCO Chem. Co., 207 F.3d 176, 180 (3d Cir. 2000) (internal quotation marks omitted); Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 676 (3d Cir. 2002) ("A motion for a new trial should be granted where substantial errors occurred in admission or rejection of evidence."). In the context of evidentiary issues raised in support of a request for a new trial, "particular deference is appropriate where the decision to grant or deny a new trial rested on the district court's evidentiary ruling that itself was entrusted to the trial court's discretion." Becker, 207 F.3d at 180 (internal quotation marks omitted).

We review preserved evidentiary objections for abuse of discretion. McKenna v. City of Phila., 582 F.3d 447, 460 (3d Cir. 2009). Where, however, a party failed to object to the admission of evidence before the District Court, we deem that objection waived on appeal. See Lloyd v. HOVENSA, LLC, 369 F.3d 263, 272-73 (3d Cir. 2004) (observing that "it is inappropriate for an appellate court to consider a contention

---

instructions." Richardson v. Marsh, 481 U.S. 200, 211 (1987).

raised on appeal that was not initially presented to the district court") (internal quotation marks omitted); <u>Waldorf v. Shuta</u>, 142 F.3d 601, 629 (3d Cir. 1998) (failure to object at trial results in waiver).

Stemtech argues that the District Court abused its discretion in admitting numerous exhibits and testimony, which it claims warrant granting a new trial. To the extent Stemtech argues that the District Court erred in admitting certain evidence that lacked a proper foundation, Stemtech has waived such an objection because the District Court clearly ruled that foundation objections needed to be raised when the allegedly objectionable exhibits were offered at trial, and Stemtech failed to lodge a contemporaneous objection.

As for the 92 exhibits depicting infringing uses of Leonard's images, Stemtech objected to the admission of these exhibits on relevance and foundation grounds. The District Court properly overruled the foundation objections, as a foundation for the documents was laid. First, Leonard explained how he found the items and identified the indicia within the items that showed their connection to Stemtech. Second, Leonard testified that he contacted certain website owners and learned they were Stemtech distributors. Third, Stemtech failed to provide a basis to question whether the websites embodied in the screenshots were connected to the Stemtech enterprise. In addition to the fact that the contents of the screenshots showed their connections with Stemtech, Dr. Rivka Rachel, a Stemtech distributor, testified about several Stemtech websites that were captured in the Leonard's screenshots.

Furthermore, the exhibits were relevant because, as the District Court stated, they are "part of what is at issue in terms of the allegations of infringement," since they reflect the infringements Leonard discovered online. J.A. 850. For these reasons, the District Court properly admitted the documents embodying the infringing images.

We have reviewed all of Stemtech's other arguments concerning its evidentiary objections and conclude that the arguments have either been waived or are meritless because the admission of the evidence about which Stemtech complains did not affect its substantial rights.

For these reasons, none of Stemtech's evidentiary arguments warrants a new trial.

### E. Fee Disputes

Finally, we address the two attorneys' fees disputes: one arising from a discovery-related award and the second stemming from the second lawsuit Leonard filed against Stemtech.

### 1. Discovery Violation Award

Stemtech challenges the District Court's order granting Leonard fees and costs incurred in taking a Stemtech employee's deposition.[25] Fed. R. Civ. P. 37(c)(2) provides:
> If a party fails to admit what is requested under Rule 36 and if the requesting party later proves .

---

[25] We review the decision to impose sanctions for abuse of discretion. <u>Bowers v. Nat'l Collegiate Athletic Ass'n</u>, 475 F.3d 524, 538 (3d Cir. 2007).

45

. . the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless:

> (A) the request was held objectionable under Rule 36(a);
> (B) the admission sought was of no substantial importance;
> (C) the party failing to admit had a reasonable ground to believe that it     might prevail on the matter; or
> (D) there was other good reason for the failure to admit.

Fed. R. Civ. P. 37(c)(2).

Leonard sought to prove that Stemtech controlled its distributors through, among other things, the use of Requests for Admission under Fed. R. Civ. P. 36.[26] To this end, Leonard sent Requests for Admission to Stemtech "seeking Stemtech's admission that it provided its independent distributors with internet sub-domains to the official Stemtech owned domain." Appellee's Br. 65 (citing J.A. 351-69). Stemtech denied these requests.

Leonard later deposed George Tashjian, Stemtech's Information Technology Director. Tashjian testified that (1) he had never seen the requests for admission, nor had he been asked for his input into the answers; (2) Stemtech provided

---

[26] Rule 36 provides a tool to streamline the proof of controverted facts. See Fed. R. Civ. P. 36.

distributors with internet sub-domains associated with Stemtech's parent website, stemtechbiz.com; and (3) the requests for admission concerning Stemtech's ownership of the domain that Stemtech denied were, in fact, true and should have been admitted. Tashjian's testimony therefore established that Stemtech wrongly denied certain requests for admissions.

Nearly two years later, Leonard moved for an award of fees and costs incurred in taking Tashjian's deposition. See Fed. R. Civ. P. 37(c)(2). The District Court granted the motion in part, awarding 50% of the $3,048.30 requested, because only a portion of the deposition pertained to the control issue.

Stemtech's conduct falls within the ambit of Rule 37(c)(2) and, despite Stemtech's argument that the sanctions motion was not expeditiously filed and the requested admission pertained to a matter of no substantial importance under Rule 37(c)(2)(B), this exception to the mandatory imposition of sanctions does not apply. Leonard sought the admission of facts concerning Stemtech's control over its distributors' websites, which was a crucial component of Leonard's vicarious and contributory infringement claims. Because this issue was central to Leonard's secondary infringement claims, Stemtech had no factual basis for denying the request, and Leonard incurred expenses to prove these facts during Tashjian's deposition, the District Court did not abuse its discretion in awarding sanctions to Leonard. See Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC, 774 F.3d 1065, 1074-75 (6th Cir. 2014) (holding that the district court did not abuse its discretion in awarding nominal Rule 37(c)(2) sanctions and costs where withholding party

47

"did not have reasonable grounds to believe it might prevail").

### 2. Stemtech's Prevailing Party Fee Request

We are also asked to review a fee ruling arising from Leonard's second lawsuit against Stemtech, alleging new infringing uses he discovered while this case was pending. The District Court granted Stemtech's motion for summary judgment in the second case. As the prevailing party in the second suit, Stemtech moved for an award of attorney's fees pursuant to 17 U.S.C. § 505. The District Court denied the motion.

The Copyright Act permits a discretionary award of attorneys' fees to the prevailing party in a copyright lawsuit. 17 U.S.C. § 505; Fogerty v. Fantasy, Inc., 510 U.S. 517, 533 (1994) (noting § 505 "clearly connotes discretion" and a district court may not "award[] attorney's fees as a matter of course"). Several factors guide the exercise of discretion in this context, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Id. at 534 n.19 (quoting Lieb. v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986)). The Supreme Court recently reaffirmed that § 505 fee awards are discretionary and placed extra, but not controlling, weight on the "objective unreasonableness" factor, and reminded courts to consider the totality of the circumstances and make a "particularized, case-by-case assessment." Kirtsaeng v. John Wiley & Sons, Inc., 136 S. Ct. 1979, 1985 (2016) (quoting Fogerty, 510 U.S. at 527, 534 n.19).

The District Court did not abuse its discretion when it denied Stemtech's fee motion in the second suit. The District Court applied the Fogerty factors and determined that there was no evidence that Leonard's decision to file the second suit was objectively unreasonable, frivolous, or in bad faith because "Leonard ha[d] reason to believe Stemtech was engaged in ongoing and new infringement, that was not the subject of [the first suit]," and accordingly "had a non-sanctionable, non-frivolous basis to file [the second suit]." J.A. 40. Despite the temporal proximity between the filing of the second suit and unfavorable rulings in this case, where Leonard was denied leave to amend his complaint and the ability to seek infringer's profits and statutory damages, the District Court appropriately adopted the Magistrate Judge's findings that "the filing of [the second suit] was not an end-run around" these adverse rulings in the first suit but rather stemmed from Leonard's belief that Stemtech continued to engage in new infringing activity, and thus was not "a bad faith attempt to re-litigate issues that have been decided [against Leonard] in [the first suit]." J.A. 40-41 (internal quotation marks omitted). Because it had a factual basis for concluding that the filing of the second suit was objectively reasonable, the District Court acted within its discretion in denying Stemtech's fee motion.

III

For the foregoing reasons, we will affirm the District Court's rulings on all issues except for its order denying Leonard's motion for prejudgment interest, which we will vacate and remand for further proceedings.

49