# United States Court of Appeals for the Federal Circuit

---

**INGEVITY CORPORATION, INGEVITY SOUTH CAROLINA, LLC,**
*Plaintiffs-Appellants*

**v.**

**BASF CORPORATION,**
*Defendant-Appellee*

---

2024-1577

---

Appeal from the United States District Court for the District of Delaware in No. 1:18-cv-01391-RGA, Judge Richard G. Andrews.

---

Decided: February 11, 2026

---

WES EARNHARDT, Cravath Swaine & Moore LLP, New York, NY, argued for plaintiffs-appellants. Also represented by SHARONMOYEE GOSWAMI.

PAUL ALESSIO MEZZINA, King & Spalding LLP, Washington, DC, argued for defendant-appellee. Also represented by ALEXANDER KAZAM, CHRISTOPHER YOOK; BRIAN EUTERMOSER, Denver, CO; THOMAS FRIEL, Palo Alto, CA.

---

Before LOURIE, PROST, and CUNNINGHAM, *Circuit Judges.*

LOURIE, *Circuit Judge.*

Ingevity Corporation and Ingevity South Carolina, LLC (together, "Ingevity") sued BASF Corporation ("BASF") in the United States District Court for the District of Delaware for infringement of U.S. Patent RE38,844 ("the '844 patent"). The district court granted summary judgment of invalidity of the asserted claims (1, 4, 11, 18, 19, 24, 43 and 48) of the '844 patent. *See Ingevity Corp. v. BASF Corp.*, 501 F. Supp. 3d 274 (D. Del. 2020). It later denied both parties' motions for partial summary judgment on BASF's antitrust and tortious interference counterclaims and then held a jury trial on those claims. J.A. 39–43. At trial, the jury found, in relevant part, that Ingevity had engaged in unlawful tying and awarded damages accordingly. J.A. 9087–90, 51–52. The district court subsequently denied Ingevity's renewed motion for judgment as a matter of law and motion for a new trial. *See Ingevity Corp. v. BASF Corp.*, No. 18-cv-1391-RGA, 2024 WL 579667 (D. Del. Feb. 13, 2024) ("*JMOL Decision*"). Ingevity timely appealed. For the following reasons, we affirm Ingevity's antitrust liability and the corresponding damages award and therefore need not reach the remaining issues raised on appeal.

## BACKGROUND

Ingevity and BASF both manufacture carbon honeycombs, an activated carbon structure that can be used to filter airborne pollutants in a variety of applications. Both companies market carbon honeycombs for use in automobile air-intake systems and fuel vapor canisters. Air-intake products control emissions by filtering incoming air before it enters the engine, while fuel vapor canisters control emissions by capturing gasoline vapors released from a vehicle's gas tank before they escape into the atmosphere.

Ingevity owns the '844 patent, which describes and claims systems and methods for reducing emissions from a car's gas tank. '844 patent col. 1 ll. 14–23. Specifically, the '844 patent is directed to a dual-stage fuel-vapor canister system that combines a higher-capacity gas-tank-side adsorbent with a lower-capacity vent-side adsorbent. *See, e.g., id.* at col. 10 ll. 36–44 (claim 1). Notably, carbon honeycombs used in air-intake systems do not come within the scope of the '844 patent, but honeycombs used in fuel vapor canisters do. *See JMOL Decision*, 2024 WL 579667, at *2; Ingevity Op. Br. 20.

In 2016, BASF began marketing its EvapTrap XC, a carbon honeycomb with dimensions and cell density comparable to Ingevity's honeycomb products but produced using different materials and manufacturing processes. In 2018, Ingevity sued BASF, asserting infringement of the '844 patent by testing and marketing EvapTrap XC. BASF responded by arguing that the patent was not infringed, was invalid on multiple grounds, and was unenforceable due to patent misuse.

BASF also brought counterclaims for unlawful tying and exclusive dealing under the federal antitrust laws and tortious interference under Delaware law. As relevant here, regarding its unlawful tying claim, BASF alleged that Ingevity conditioned licenses to the '844 patent (the tying product) on customers' agreements to fulfill their honeycomb product needs by exclusively purchasing Ingevity's unpatented honeycomb products (the tied products) in violation of the Sherman Act, 15 U.S.C. §§ 1 or 2 (1988). The infringing or non-infringing use of Ingevity's unpatented honeycomb products is the key issue in this appeal, as will be seen hereinbelow.

I

At summary judgment on patent validity, the district court ruled that Ingevity's '844 patent is invalid based on prior invention "by another" under pre-AIA 35 U.S.C.

§ 102(g).[1]  J.A. 37.  Both parties then filed motions for partial summary judgment on BASF's counterclaims.  J.A. 39. Ingevity argued that its conduct alleged to be tying and exclusive dealing did not violate the antitrust laws because its honeycomb products were "nonstaple goods," *i.e.*, goods lacking substantial non-infringing uses, and therefore protected from antitrust liability under the patent laws.  The district court explained that whether Ingevity's honeycombs had substantial non-infringing uses beyond the '844 patent was "a jury issue."  J.A. 41.  It observed that while "Ingevity's records . . . suggest that Ingevity has sold the same articles to others for [non-infringing] uses[,]" Ingevity "says the records are inconclusive, contain mistakes, etc.," which, to the court, created a "disputed issue of material fact."  *Id.*

Ingevity also asserted immunity under the *Noerr-Pennington* doctrine, which shields certain conduct from antitrust liability when it involves petitioning the government. J.A. 4291.  It argued that its tying conduct merely consisted of "threat[s] to sue [customers] for patent infringement" and nothing more.  *Id.*  The district court declined to resolve the immunity issue on the existing record, explaining that it could not decide the matter "more than tentatively" and that a definitive ruling would have to await trial.  J.A. 42–43.  The court nevertheless previewed its view, stating that "*Noerr-Pennington* will [not] help Ingevity if BASF proves the Ingevity product . . . is a staple" because "the *Noerr-Pennington* doctrine [does not] eradicate[] the boundaries that the Supreme Court has described in similar contexts."

---

[1]    In a separate proceeding, the International Trade Commission ruled that all claims of the '844 patent asserted here were invalid on the same ground, and we affirmed that decision.  *Ingevity Corp. v. Int'l Trade Comm'n*, No. 20-1800, 2021 WL 3440786, at *1 (Fed. Cir. July 21, 2021).

J.A. 43 (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 136 (1969) ("[T]he patentee . . . may not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent monopoly.")).  The district court therefore denied both parties' summary judgment motions.  J.A. 39.

## II

BASF's antitrust and tortious interference counterclaims were then tried to a jury.  *See* J.A. 51–52.  The jury heard evidence of unlawful tying, including testimony from Ed Woodcock, president of Ingevity's automotive-products division, who admitted at trial that "in order to obtain a license [to the '844 patent,] Ingevity requires that customers buy the honeycombs only from Ingevity."  J.A. 9476.  The district court later instructed the jury that "[a] patent owner has the right to control the market" for "nonstaple goods" but "has no right to control the market for" staple goods—those suitable for actual and substantial non-infringing uses.  J.A. 9032 (Jury Instruction 4.2).  The instruction concluded that if the jury "determine[s] that BASF has not met its burden to prove that the carbon honeycombs at issue are staple goods, [the jury] must find for Ingevity on the tying . . . claim[]."  *Id.*  The jury found that BASF had proven by a preponderance of the evidence that Ingevity had engaged in the unlawful tying of its '844 patent licenses to sales of its carbon honeycombs in violation of Sections 1 or 2 of the Sherman Act.[2]  J.A. 9087.  It then

---

[2]    The jury also found Ingevity liable on all other counts, including claims of exclusive dealing and tortious interference, and awarded damages accordingly.  J.A. 9088–89.  The damages amount for unlawful tying, $28,285,714, was larger than any other claim's damages amount, and the parties agreed that the damages for the

awarded BASF $28,285,714 in antitrust damages. J.A. 9089.

## III

After the jury entered its verdict but before the district court entered its judgment, the district court directed BASF to submit proposed findings and conclusions of law on Ingevity's immunity defenses with Ingevity's responses to follow. J.A. 127. In its response, Ingevity acknowledged that "tying and bad-faith patent enforcement are separate bases for liability," J.A. 11241, but continued to deny that it had created a tying arrangement. Specifically, Ingevity asserted that it never "told customers they were required to purchase Ingevity's honeycombs to receive a 'license'" to the '844 patent, J.A. 11234, but merely "communicated to customers what does and does not infringe" the patent, J.A. 11229. Because that conduct, Ingevity argued, was limited to communications, it was entitled to immunity under the patent laws and *Noerr-Pennington*. *Id.* The district court rejected Ingevity's immunity argument because "the jury found otherwise." J.A. 47. It explained that the jury was "instructed that it could not find illegal tying if Ingevity's conduct was limited to 'communications about its patent rights to customers,'" such that it was "straightforward" that "the conduct upon which the jury

---

other claims were not cumulative. J.A. 9086. Therefore, the total amount of damages was simply the unlawful tying damages amount of $28,285,714 (later trebled to $84,857,142 by the district court, J.A. 51–52). Because we affirm the jury's unlawful tying findings and the corresponding damages, *infra* Discussion §§ I.A–C, we need not address the other claims on appeal. *See* Oral Arg. at 12:21–35, Appeal No. 24–1577, available at https://www.cafc.uscourts.gov/oral-arguments/24-1577_12 052025.mp3 (Ingevity's counsel agreeing that the other claims are mooted if we affirm on tying).

based its [unlawful tying] finding was not limited to protected communications about [Ingevity's] patent rights."[3] *Id.* The court therefore concluded that "neither the *Noerr-Pennington* doctrine nor the patent laws immunize Ingevity's conduct." J.A. 46.

## IV

Ingevity then moved for judgment as a matter of law or a new trial. *JMOL Decision*, 2024 WL 579667, at \*1; J.A. 10590–95 (Ingevity's excerpted JMOL briefing). As relevant here, Ingevity challenged the jury's verdict as to unlawful tying under federal antitrust law by asserting a statutory patent misuse defense under 35 U.S.C. § 271(d).[4] D.I. 594 at 3. It argued that "a patent holder has a 'statutory right to control nonstaple goods that are capable only of infringing use in a patented invention,' even if it would 'suppress competition in the market for an unpatented commodity.'" *Id.* at 2 (quoting *Dawson Chem. Co. v. Rohm*

---

[3] Jury Instruction 4.1 provided that "Ingevity has the right under the patent laws to enforce its patents, including through licensing, through communications about its patent rights to customers and competitors, and through litigation," as well as a First Amendment right "to file a lawsuit, to threaten litigation, and to communicate with customers about litigation." J.A. 9031. The jury was further instructed that "[e]vidence of the exercise of such rights cannot form the basis for BASF's antitrust claims or BASF's tortious interference claim." *Id.* Notably, "Ingevity did not make or renew any objections to Final Jury Instruction 4.1 when the instructions were being finalized." J.A. 46 n.2.

[4] The Joint Appendix excerpts Ingevity's opening JMOL briefing such that it begins at page 8. For pages 1 to 7, we will directly cite the district court's docket number, D.I. 594, and the corresponding brief page, as the district court did.

*& Haas Co.*, 448 U.S. 176, 202, 213 (1980)). On that basis, Ingevity argued that substantial evidence did not support the jury's staple good finding underlying the unlawful tying verdict. *JMOL Decision*, 2024 WL 579667, at *2. It specifically contended that there was no record "evidence that: (1) Ingevity intended its honeycombs to be used outside of fuel vapor canisters . . . ; (2) anyone actually used Ingevity's honeycombs in air-intake systems; and (3) any non-infringing uses were substantial." *Id.* BASF responded that the jury was properly instructed on the factual question of staple goods and was free to reject Ingevity's position. J.A. 10611.

Alternatively, Ingevity reframed its tying conduct as mere "[c]ommunications about patent rights" in an attempt to obtain immunity under the patent laws and *Noerr-Pennington*. *Id.* at 10597–98 (citations omitted). Specifically, it argued that "[t]here is no evidence that Ingevity engaged in any alleged tying . . . conduct besides the indisputably immune express or implied statements that Ingevity would enforce its patents against conduct Ingevity believed was infringing." *Id.* at 10598; *see also id.* ("The sum total of what BASF cites as evidence of 'tying' consists of Ingevity telling its customers that it did not consider use of Ingevity's adsorbents to be infringing the '844 [p]atent, but use of competitors' adsorbents would be.").

The district court rejected both of Ingevity's arguments. First, while "drawing all logical inferences in favor of BASF," the district court concluded that "there was substantial evidence in the record supporting the jury's determination that Ingevity's honeycombs are staple goods" with actual and substantial non-infringing uses. *JMOL Decision*, 2024 WL 579667, at *6. The district court explained that the jury could reasonably have found that there were (1) sales of Ingevity's honeycombs for non-infringing uses based on contemporaneous business records reflecting repeated sales for air-intake applications over multiple years, *id.* at *4; (2) actual non-infringing use

based on evidence of repeated purchases for those applications, *id.* at \*5; and (3) substantial non-infringing use based on the volume, practicality, and recurring nature of those uses, without resort to rigid percentage thresholds, *id.* at \*5–6. Because, as the court reasoned, the jury's "staple good" finding rested on permissible inferences and credibility determinations supported by substantial evidence, it declined to disturb the jury's verdict on antitrust tying liability and accordingly denied judgment as a matter of law. *Id.* at \*6.

Second, the district court rejected Ingevity's contention that its conduct was immunized by the patent laws and *Noerr-Pennington*. *Id.* at \*8–9. The court held that "[t]he jury could reasonably have found a classic tying arrangement" based on conduct extending beyond protected patent communications; specifically, it pointed to testimony from Woodcock showing that Ingevity conditioned licenses to the '844 patent on the purchase of its honeycombs. *Id.* at \*9. Thus, because the jury found that Ingevity's honeycombs were staple goods, the district court explained, they did not have an implied license under the '844 patent. *Id.* Moreover, the district court explained that such finding necessarily precluded Ingevity's argument that its conduct could be recast as only patent enforcement activity. *Id.* The district court therefore concluded that immunity did not apply and accordingly denied judgment as a matter of law. *Id.*

Separately, Ingevity challenged the jury's damages award on two grounds. First, it argued that BASF failed to disaggregate damages attributable to unlawful conduct from those caused by lawful patent enforcement. *Id.* at \*6. Second, Ingevity argued that the damages model was speculative, asserting there was insufficient evidence to support the expert's assumption that BASF would have captured a 50% market share and sold millions of honeycombs despite lacking product certification or prior sales. *Id.* The court rejected those contentions and explained that BASF needed to show only that Ingevity's unlawful

10          INGEVITY CORPORATION v. BASF CORPORATION

conduct was a material cause of its injury. *Id.* at *7 (citation omitted). The district court then determined that substantial evidence supported the jury's damages award and further concluded that the jury reasonably accepted BASF's expert testimony that disaggregation was impracticable and that the damages model was not speculative. *Id.* at *7–8.

Ingevity timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

### DISCUSSION

Ingevity argues that the district court erred in denying it judgment as a matter of law and challenges the sufficiency of the evidence supporting the jury's finding of unlawful tying under federal antitrust law.[5] It does so by advancing a theory of defense to antitrust liability and, separately, a theory of immunity from antitrust liability. Ingevity also challenges the jury's antitrust damages award.

First, Ingevity asserts a statutory patent misuse defense under § 271(d) of the Patent Act supported by the

---

[5] Ingevity also challenges the district court's summary judgment ruling on patent invalidity, but we need not address that ruling on appeal. As discussed below, we affirm the jury's finding of unlawful tying, *see infra* Discussion §§ I.A–B, and the '844 patent expired on March 18, 2022, J.A. 8023. Accordingly, Ingevity's appeal of the invalidity ruling is dismissed as moot. *See Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (unlawful tying makes the underlying patent "unenforceable"); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1322 (Fed. Cir. 2008) ("A determination of unenforceability . . . moots any issue of invalidity." (citation omitted)). Ingevity's counsel agreed. *See* Oral Arg. at 11:39–54.

related "staple article" doctrine. *See* Ingevity Op. Br. 34–47. It argues that the jury's verdict was not supported by substantial evidence because BASF failed to show that Ingevity's honeycombs (the tied product) are staple goods, and, as such, Ingevity has the statutory right under the patent laws to control those nonstaple goods. *Id.* at 34–35 (citing *Rohm & Haas*, 448 U.S. at 213).

Second, Ingevity argues that its purported tying conduct is immune from antitrust liability under the patent laws and *Noerr-Pennington. Id.* at 47–57. It contends that whether or not the jury's staple goods finding was correct, "such enforcement activities are immune from antitrust liability" "[b]ecause Ingevity has the right under the patent laws and the First Amendment to enforce its patents in good faith." *Id.* at 48. It further contends that its immunity argument holds true "even if Ingevity were mistaken about the scope of its patent rights." *Id.*

Third, Ingevity argues that the jury's antitrust damages award should be vacated because BASF failed to disaggregate the damages caused by Ingevity's unlawful conduct from those resulting from its lawful patent enforcement and that such disaggregation was required and feasible. *Id.* at 61–67.

We discuss each argument in turn.

I

We apply our own law with respect to patent law issues. *Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 104 F.4th 1370, 1376 (Fed. Cir. 2024). For matters not unique to patent law, we apply the law of the regional circuit, here, the Third Circuit. *Versata Software, Inc. v. Callidus Software, Inc.*, 780 F.3d 1134, 1136 (Fed. Cir. 2015) (applying Third Circuit law). The Third Circuit "reviews a grant or denial of summary judgment *de novo*, applying the same standard as the District Court."

*Stratechuk v. Bd. of Educ.*, 587 F.3d 597, 603 (3d Cir. 2009) (citation modified).

Likewise, the Third Circuit reviews grants and denials of motions for judgment as a matter of law under Rule 50(b) *de novo, Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1333 (Fed. Cir. 2011), but that review remains highly deferential to the jury's verdict. "[A] jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict," *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (internal quotation marks and citations omitted), a standard akin to the familiar substantial evidence standard, *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995).

Finally, the Third Circuit reviews orders on motions "for a new trial for abuse of discretion unless the court's denial is based on the application of a legal precept, in which case the standard of review is plenary." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993).

A

We first address Ingevity's antitrust liability, which was based on the jury's finding that Ingevity unlawfully tied licenses to its '844 patent to its unpatented carbon honeycomb products in violation of the Sherman Act, 15 U.S.C. §§ 1 or 2. "Tying can support a Sherman Act claim either under § 1, as an unlawful restraint on trade, or under § 2, as an unlawful act of monopolization or attempted monopolization." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 397 (3d Cir. 2016) (citing Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 17.01, at 17–13 (4th ed. Supp. 2015); 15 U.S.C. §§ 1–2); *see also Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34 (2006).

As the Supreme Court has explained in *Illinois Tool Works* and elsewhere, "the essential characteristic of an

invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." 547 U.S. at 34–35 (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)). Indeed, "[e]ven if a seller has obtained a monopoly in the tying product legitimately (as by obtaining a patent), courts have seen the expansion of that power to other product markets as illegitimate and competition-suppressing." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir. 1992).

"Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Id.* Under Third Circuit law, to prove an unlawful tying under the Sherman Act, one must show that "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." *Id.* at 477.

Here, Ingevity's position rests on a statutory patent misuse defense grounded in 35 U.S.C. § 271(d), which expressly shields conduct that would otherwise be characterized as tying or exclusionary when it is undertaken to prevent contributory infringement as defined in § 271(c).[6] Ingevity Op. Br. 36–38. Section 271(c) limits contributory infringement to the sale of a "material or apparatus . . . especially made or especially adapted for use in an

---

[6] Ingevity's argument, at least on appeal, does not appear to challenge the "two distinct products" element of the antitrust tying analysis, *Town Sound*, 959 F.2d at 477, which turns on "the character of the demand for the two items," and not any "functional relation between them," *Jefferson Parish*, 466 U.S. at 19. Instead, Ingevity proceeds solely under § 271(d)'s patent misuse framework.

14         INGEVITY CORPORATION v. BASF CORPORATION

infringement . . . and not a staple article or commodity of commerce suitable for substantial noninfringing use," and § 271(d) correspondingly provides that a patent owner shall not "be denied relief or deemed guilty of misuse or illegal extension of the patent right" by deriving revenue from, enforcing rights against, or refusing to license such contributory infringement. 35 U.S.C. §§ 271(c), (d).

As the Supreme Court explained in *Rohm & Haas*, those provisions of the Patent Act affirmatively authorize a patentee "to control nonstaple goods that are capable only of infringing use." 448 U.S. at 213; *see also id.* at 201 ("A patentee may sell a nonstaple article himself while enjoining others from marketing that same good without his authorization."). Thus, according to Ingevity, where, as here, "a patent owner seeks to control a non-staple article through its patent, there can be no antitrust liability arising from such acts during the patent's term." Ingevity Op. Br. 37 (citing *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 873 (Fed. Cir. 1997)).

To prove that Ingevity, as the patentee, was not entitled to control the goods at issue—thus engaging in unlawful tying—BASF needed to show by a preponderance of the evidence that the goods have actual and substantial noninfringing uses, *i.e.*, that they are staple goods. *See Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1336 (Fed. Cir. 2021) (explaining that the "substantial noninfringing uses" inquiry "focuses on the real way in which the accused product is made, used, and sold"). That is the crux of this appeal controlling the § 271(d) misuse defense. And to be "substantial," the alleged non-infringing uses may not be "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009).

Ingevity contends that "BASF failed to adduce any evidence meeting those criteria, and the district court's contrary order denying Ingevity's Rule 50(b) motion should be

reversed." Ingevity Op. Br. 38 (emphasis omitted). Specifically, Ingevity argues that (1) its records showing sales for non-infringing uses are "typographical errors"; (2) the non-infringing uses are "impossible"; (3) even if accurate, the records are insufficient to prove "actual" non-infringing uses; and (4) 18,000+ non-infringing uses is not a "substantial" amount. *Id.* at 38–47 (citations omitted). We disagree. As the district court aptly concluded, "there was substantial evidence in the record supporting the jury's determination that Ingevity's honeycombs are staple goods." *JMOL Decision*, 2024 WL 579667, at *6. We now address each of Ingevity's challenges as described above.

As a threshold matter, each of Ingevity's arguments seeks to relitigate factual disputes the jury resolved in BASF's favor. But we may not second-guess the jury's "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," and we must "disregard all evidence favorable to [Ingevity] that the jury [was] not required to believe." *Avaya Inc.*, 838 F.3d at 373 (internal quotation marks and citation omitted). Thus, "judgment as a matter of law could only have been appropriate in the extraordinary circumstance that none of that evidence could lead a reasonable jury to find" that Ingevity's honeycomb products were staple goods. *Id.*

The jury heard substantial evidence regarding Ingevity's honeycombs and their potential use in non-infringing air intake systems. The parties do not dispute that honeycomb use in air-intake systems is non-infringing under the '844 patent. *See JMOL Decision*, 2024 WL 579667, at *2; Ingevity Op. Br. 20. And BASF introduced Ingevity's own sales records and spreadsheets showing repeated purchases by customers Toledo Molding & Die ("Toledo"), Stant, and SumiRiko for a non-infringing "end use" labeled as "CC-AIR INDUCTION SYS" or "CC-AIS Honeycombs" ("AIS" is short for "air induction system") across multiple months and years, totaling more than 18,000 units. *See*

*JMOL Decision*, 2024 WL 579667, at \*4.  The record further contained a 2010 Ingevity memo that indicated Toledo purchased Ingevity honeycombs for its air-intake systems, again non-infringing, corroborating the spreadsheet data. *Id.* (citing J.A. 8170); *see* J.A. 8170 ("TMD manufactures AIS assemblies.  They currently purchase 41x150 honeycombs for LEV2 Fords and two different Corvette parts."); *see also* J.A. 8484, 9458 (record evidence showing, per Woodcock's testimony, the "status of an air[-]intake system project for Toledo").

Ingevity, relying on Woodcock's testimony, argues that the spreadsheet entries were "typographical errors."  Ingevity Op. Br. 40.  Yet it provided no documents or other evidence corroborating Woodcock's testimony, such as testimony from the listed Ingevity salespeople or any customer witnesses stating any errors in the entries.  Ingevity also argues that it is "impossible" for its honeycombs "to be used in an air[-]intake system," *id.* at 38–39, but offered no expert testimony on this issue, *JMOL Decision*, 2024 WL 579667, at \*4.  Instead, it relied again on testimony from Woodcock and another Ingevity executive and inventor of the '844 patent, Roger Williams.  J.A. 9543, 10131.  Because credibility determinations are the jury's province and the record provided a basis for the jury's findings, the jury was entitled to discount or reject the conclusory and unsubstantiated testimony, and we may not credit that testimony in place of the jury's judgment.  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007), *as amended* (Aug. 28, 2007) ("[W]e must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury.").

BASF, on the other hand, "relied on the Park patent and the testimony of James Lyons, its technical expert, to argue" that Ingevity's honeycombs were suitable for use in air-intake systems.  *JMOL Decision*, 2024 WL 579667, at \*4 (citing J.A. 8582–83, 8585, 8772–83).  The Park patent, which covers Ingevity's honeycomb manufacturing process,

J.A. 8577, 8585, discloses that its honeycomb "desirably" has "about 540 cells per square inch" and that one "intended application[]" is "in an automobile air[-]intake system," J.A. 8779.  BASF also presented Akash Abraham's corroborating testimony where he explained that, as a former BASF employee, Toledo had contacted him to discuss buying the BASF honeycombs at issue for use in air-intake systems and raised no need for modifications or concerns about cell density.  J.A. 9307–08.  That testimony regarding honeycomb use in non-infringing air-intake systems, together with the Park patent, gave the jury sufficient reason to discount Ingevity executives' testimony and favor BASF's evidence.

The jury also heard substantial evidence of actual use. Ingevity argues that even if it did sell thousands of honeycombs for non-infringing use in air-intake systems, "it would not be evidence that any of those buyers actually used FVC honeycombs in air[-]intake systems."  Ingevity Op. Br. 39 (emphasis omitted).  But, as we explained, the jury reasonably relied on contemporaneous business records reflecting repeated sales of Ingevity's honeycombs for air-intake applications over multiple years and was entitled to treat those records as more persuasive than contrary testimony from interested witnesses.  *See JMOL Decision*, 2024 WL 579667, at *5.  From that evidence, the jury could permissibly infer that Ingevity's honeycomb products were actually used for the non-infringing purposes identified in Ingevity's own records, even in the absence of direct proof identifying a specific vehicle or installation.  *United States v. Donley*, 878 F.2d 735, 738 (3d Cir. 1989) ("Statements admitted . . . to show the declarant's intent or plan may be used to show that the declarant acted in accord with that plan."); *see also Moleculon Rsch. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("It is hornbook law that direct evidence of a fact is not necessary.").  In other words, large-volume purchases for a stated end use support a reasonable inference that

customers acted in accordance with that use.  *See* J.A. 9448 (Woodcock testimony agreeing that Ingevity's end use "refers to the anticipated customer application").

Finally, the jury heard substantial evidence that those non-infringing uses were substantial.  Rather than apply a rigid proportionality or percentage-of-sales test as Ingevity argues, the jury was free to consider the absolute volume of sales, their recurrence over time, and their practical feasibility in light of the technical evidence.  *See, e.g.*, *Vita-Mix Corp.*, 581 F.3d at 1327 ("[T]he frequency of infringing use . . . does not speak to the substantiality of the non-infringing use in this case."); *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1337–39 (Fed. Cir. 2012).  Moreover, the jury instructions did not confine the jury to a comparative evaluation, *see* J.A. 9032, and Ingevity did not argue that there were any errors in that instruction, *JMOL Decision*, 2024 WL 579667, at *2. Accordingly, viewing the evidence under the proper legal standard, the jury reasonably found that the accused products had substantial non-infringing uses, and that finding was supported by sufficient evidence.  That the products had substantial non-infringing uses means that they are staples.

In sum, because the jury's verdict rested on permissible inferences and credibility determinations supported by the record, substantial evidence supports the finding that Ingevity's honeycombs are staple goods.  Thus, Ingevity's patent misuse-based defense fails.

B

Ingevity next argues that its conduct is immune from antitrust liability. Ingevity Op. Br. 47–48.  It contends that "[e]ven if the jury's implicit finding that Ingevity's FVC honeycombs are staple articles were correct (it is not), Ingevity had a good-faith belief that the honeycombs are non-staple articles" and thus "immunity applies." *Id.* BASF responds, arguing that Ingevity's modified immunity

argument is forfeited and meritless. BASF Resp. Br. 46–53. It argues that at summary judgment and later at trial, Ingevity's immunity argument was premised on equating its alleged tying conduct to mere patent enforcement activity. *Id.* at 49–53. But now, on appeal, BASF further asserts that Ingevity's immunity argument posits that actual tying conduct—*i.e.*, conditioning a license on the purchase of a staple article—is itself immune activity regardless whether it is mere patent enforcement activity or something more. *Id.* at 48 (citing Ingevity Op. Br. 47).

We agree with BASF that Ingevity's immunity argument is materially different from what was argued below and is therefore forfeited. Ingevity's immunity argument is no longer in the alternative; it now subsumes its patent-misuse defense. That modification attempts to capture on appeal what it had previously regarded as conduct not immune from antitrust liability. We may not consider such new and improperly preserved arguments. *Simko v. U.S. Steel Corp*, 992 F.3d 198, 205 (3d Cir. 2021) ("[A]rguments raised for the first time on appeal are not properly preserved for appellate review.").

At summary judgment, Ingevity's immunity argument was based on the theory that what BASF had alleged as tying conduct was actually mere patent enforcement activity and thus immune, and it further agreed that conduct beyond mere enforcement activity was not immune. *See* J.A. 7925–26 (summary judgment hearing); J.A. 9031 (agreed-to jury instruction); *see also* J.A. 47; *JMOL Decision*, 2024 WL 579667, at *8–9. That is evidenced by the colloquy between Judge Andrews and Ingevity's counsel at the summary judgment hearing. There, Judge Andrews clarified the distinction between unprotected tying conduct and protected patent enforcement communications. He stated, "I don't think [Ingevity is] saying tying and exclusive dealing are immunized. I think [Ingevity is] saying some stuff that surrounds it is immunized." J.A. 7925. Judge Andrews then asked Ingevity's counsel directly: "Are

you saying tying and exclusive dealing are immunized?" *Id.* at 7925–26. Ingevity's counsel, drawing a line between actual tying conduct and mere patent enforcement, responded that "the basis upon which we are arguing" is that "threats of litigation are immunized," and because the alleged tying conduct here is mere patent enforcement activity, despite BASF's labeling of it as tying, it is protected. *Id.*

Given that agreed-upon categorical distinction between unprotected commercial tying conduct and patent enforcement, and because the district court noted that there was a factual dispute as to which of those categories Ingevity's conduct fell under, the district court cautioned that its summary judgment denial reflected its "tentative[]" views and was not a "definitive" ruling. J.A. 42–43; *id.* at 43 (explaining that "the *Noerr-Pennington* doctrine will [not] help Ingevity if BASF proves the Ingevity product . . . is a staple article of commerce").

The distinction drawn at summary judgment was carried through trial and Ingevity's post-trial briefing. At trial, Ingevity agreed to a jury instruction stating that immunity does not apply to "conduct, such as tying or exclusive dealing, that unlawfully restricts competition beyond the scope of the patent monopoly." J.A. 9031; *see* J.A. 46 n.2 (the district court acknowledging that Ingevity did not object to the instruction). Post-trial, in its proposed findings and conclusions of law response, "Ingevity agree[d] that tying and bad-faith patent enforcement are separate bases for liability," J.A. 11241, and continued to argue that its conduct was immune because it did "nothing more than . . . communicate[] to customers what does and does not infringe," J.A. 47 (citing J.A. 11229).

The district court rejected that argument because "the conduct upon which the jury based its finding was not limited to protected communications." J.A. 47. Stated differently, the jury was instructed that patent enforcement

communications alone could not support a tying violation, so by finding unlawful tying, the properly-instructed jury necessarily found that Ingevity's conduct went beyond protected patent communications. *See id.* Ingevity subsequently made the same argument in its JMOL motion, equating its tying conduct to mere "statements to convey that it would enforce its patents." *JMOL Decision*, 2024 WL 579667, at \*8. The district court again rejected that argument because the evidence supported a finding of "a classic tying arrangement." *Id.* at \*9.

But now, for the first time on appeal, Ingevity erases that distinction. *See* Ingevity Reply Br. 23 ("BASF's Alleged Distinction Between 'Communications' and 'Conduct' Is Unsupported."). It argues that even if the jury found that its honeycomb products are staple goods, its tying conduct is still immune. Ingevity Op. Br. 47–48. Counsel for Ingevity made this change clear at oral argument when he stated that "there are two separate issues: *Noerr-Pennington*, which is one basis for immunity, and *Rohm & Haas*, which is another [basis for immunity], so all of the statements about *Noerr-Pennington* and statements about communications are not relevant to the ruling about *Rohm & Haas*." *See* Oral Arg. at 21:47–22:01. He went on to explain that Ingevity's argument "today is about *Rohm & Haas*, which is about conduct and [regardless of] whether [] you are wrong about [the] staple versus non-staple comparison that right is important as all the other rights for you to have immunity." *Id.* at 22:11–21. In effect, Ingevity's counsel newly argued at oral argument that *Rohm & Haas* supplies a freestanding immunity for tying conduct independent of *Noerr-Pennington* and independent of whether the honeycombs are staple goods, collapsing the

jury's staple good finding into an immunity argument never presented below.[7]

Ingevity's reframing of its arguments underscores its forfeiture. Throughout summary judgment, trial, post-trial proceedings, and its opening brief on appeal, Ingevity tied its immunity theory to *patent enforcement communications* and expressly disclaimed any contention that actual "tying and exclusive dealing are immunized." *See* J.A. 7925–26; J.A. 9031; J.A. 47; *JMOL Decision*, 2024 WL 579667, at *8–9. The citations Ingevity provides suggest the same. *See, e.g.*, J.A. 4293 (Ingevity's summary judgment immunity arguments cabined to patent enforcement activity, and do not extend to conduct beyond enforcement); J.A. 7927–28 (same at trial); J.A. 10598 (same post-trial). Having litigated and lost on that theory below, Ingevity may not now advance a distinct argument that *tying conduct itself* is immune notwithstanding the jury's staple good finding.[8]

---

[7] Notably, Ingevity cites *Rohm & Haas* only for immunity purposes in its reply brief and only for the uncontroversial proposition that "the right to control unpatented non-staple goods is no different than the right to control 'claimed' aspects of the same patent." Ingevity Reply Br. 26 (citing *Rohm & Haas*, 448 U.S. at 201).

[8] Even assuming that Ingevity raises the argument that it presented below—*i.e.*, its alleged tying conduct is itself only protected patent enforcement activity and nothing more, *see* J.A. 11229—that argument fails. We agree with the district court that the conduct at issue here goes beyond any protected patent enforcement activity. *See JMOL Decision*, 2024 WL 579667, at *9. Substantial evidence shows that the only way to get a license to the '844 patent was to purchase Ingevity's staple honeycomb products. *See*

Ingevity challenges the immunity-based jury instruc-
tion on the same basis. Ingevity Op. Br. 54–57 (citing J.A.
9031). Because Ingevity forfeited its immunity argument,
its jury instruction challenge is reviewed only for plain er-
ror, which we "exercise[] sparingly" and "with extreme cau-
tion in the civil context." *Lesende v. Borrero*, 752 F.3d 324,
336 (3d Cir. 2014) (quoting *Franklin Prescriptions, Inc. v.
N.Y. Times Co.*, 424 F.3d 336, 340 (3d Cir. 2005)); *see* Fed.
R. Civ. P. 51(d)(2). An instructional error "is plain only
where the proper course is clear under current law," *Col-
lins v. Alco Parking Corp.*, 448 F.3d 652, 655–56 (3d Cir.
2006) (citation modified), and Ingevity's theory that good-
faith tying and exclusive dealing are immune is anything
but clear. Ingevity cites no case that has ever extended
immunity—under the *Noerr-Pennington* doctrine or the pa-
tent laws—to anticompetitive commercial conduct like ty-
ing and exclusive dealing because there is none. In fact,
counsel for Ingevity, in response to the question whether
"there [is] any case law . . . where there is actual tying of
staple goods . . . and immunity applies," admitted that
"[t]here is no case either way." *See* Oral Arg. at 22:21–32.

Moreover, even *Rohm & Haas*, which Ingevity's coun-
sel claims for the first time at oral argument supports this
new proposition, is distinct because that case, unlike here,
involved a nonstaple good finding and thus there was no

---

J.A. 9476; *JMOL Decision*, 2024 WL 579667, at *3–6. That
is commercial conduct that goes beyond education about
Ingevity's patent rights. *See Sorrell v. IMS Health Inc.*,
564 U.S. 552, 567 (2011) ("[R]estrictions on protected ex-
pression are distinct from restrictions on economic activity"
like those in the "antitrust laws"); *see also FTC v. Actavis,
Inc.*, 570 U.S. 136, 150 (2013) ("[T]he Court has struck
down overly restrictive patent licensing agreements—irre-
spective of whether those agreements produced supra-pa-
tent-permitted revenues.").

issue of immunity left. *Rohm & Haas*, 448 U.S. at 199 ("[P]ropanil is a nonstaple commodity which has no use except through practice of the patented method."); *id.* at 201–02 ("[T]he provisions of § 271(d) effectively confer upon the patentee . . . a limited power to exclude others from competition in nonstaple goods," and "Rohm & Haas' conduct is not dissimilar in either nature or effect from the conduct that is thus clearly embraced within § 271(d)."). Ingevity similarly overreads *Brulotte v. Thys Co.*, which it contends equates enforcing an expired patent with illegal tying for immunity purposes. Ingevity Reply Br. 25 (citing *Brulotte v. Thys Co.*, 379 U.S. 29, 32 (1964)). *Brulotte* instead uses tying as an analogy to illustrate that both practices impermissibly extend patent power beyond its lawful scope. *Brulotte*, 379 U.S. at 33 ("[R]oyalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by t[y]ing.").

On the record before us, the district court's instruction—which expressly excluded immunity for "conduct, such as tying or exclusive dealing, that unlawfully restricts competition beyond the scope of the patent monopoly," J.A. 9031—was reasonable and consistent with the parties' agreed framing and the governing law. At minimum, the absence of any clear authority supporting Ingevity's newly modified theory, including any potential dispute about the scope of *Rohm & Haas*, confirms that the "proper course" was not "clear under current law." *Collins*, 448 F.3d at 655–56. Any alleged error therefore falls far short of plain error warranting relief. *See id.*

## C

Upon finding Ingevity liable for antitrust conduct, the jury awarded BASF antitrust damages in the amount of $28,285,714. J.A. 9089. Ingevity argues that the "the antitrust damages judgment must be vacated because BASF never disaggregated the damages that resulted from Ingevity's unlawful conduct from that caused by Ingevity's

lawful assertion of its patent rights." Ingevity Op. Br. 61. We again disagree.

As the district court explained, "[t]o establish an antitrust injury, BASF was not required to show that the accused conduct was the sole cause of its injury; BASF needed to show that Ingevity's conduct was a material or substantial cause of its injury." *JMOL Decision*, 2024 WL 579667, at *7; *see Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206, 210 (3d Cir. 1983) ("It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury." (quoting *Zenith Radio*, 395 U.S. at 114 n.9)).

First, "[t]he jury instructions, to which Ingevity d[id] not object, are consistent with this [materiality] requirement." *JMOL Decision*, 2024 WL 579667, at *7 (citing J.A. 9065 ("BASF is entitled to recover damages for an injury to its business or property if it can establish . . . that the alleged illegal conduct was a material cause of BASF's injury.")). Second, there was substantial evidence for the jury to have reasonably found that Ingevity's tying conduct was a material cause of the injury. Dr. Divya Mathur, BASF's damages expert, testified that Ingevity's conduct prevented BASF from selling honeycombs to canister makers for use in five automakers' vehicles, and that conclusion was supported by evidence that BASF's honeycombs were cheaper and performed better than Ingevity's products, and that several automakers expressed interest in BASF's honeycombs and undertook validation testing. *See JMOL Decision*, 2024 WL 579667, at *7 (citations omitted). The jury also heard evidence that Ingevity internally viewed BASF's product as a competitive "threat" and responded by selectively raising prices to coerce customers into exclusivity and by conditioning patent licenses on the purchase of Ingevity honeycombs—conduct that directly foreclosed BASF from making sales it otherwise could have made. *See id.* Taken together, that is substantial evidence for the jury

to have found material causation. *See Danny Kresky*, 716 F.2d at 210.

Furthermore, the jury could reasonably credit Dr. Mathur's testimony that disaggregating damages caused by lawful versus unlawful conduct was impossible, given that the same exclusionary practices simultaneously affected price, access, and customer choice and because Ingevity "bear[s] the risk of the uncertainty which [its] own wrong has created." *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946); *cf. Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1243 (7th Cir. 1982) (A court may not "deprive [plaintiff] of [its] recovery merely because the jury may have found that [defendant] combined lawful conduct with unlawful conduct[,] making it impossible to determine which portion of the total damages was caused by the unlawful conduct."); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962) ("[A]cts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme.").

Ingevity's expert argued that disaggregation was feasible, but the jury was entitled to reject Ingevity's position and conclude that disaggregation was impossible based on Dr. Mathur's opinion. *See Waldorf v. Shuta*, 142 F.3d 601, 624 (3d Cir. 1998) (denying motion for a new trial because the jury was entitled to credit one expert's damages evidence). That is particularly appropriate here, where the jury heard testimony from both parties' experts that Ingevity's expert proposed an analysis that did not necessarily account for the unlawful conduct at issue. *JMOL Decision*, 2024 WL 579667, at *7 (citation omitted); *see* J.A. 10057, 10281–10282, 9705 (trial testimony that Ingevity's expert lacked critical information regarding unlawful conduct at the time of evaluation). In light of this evidence and Dr. Mathur's reliance on a broad set of record documents rather than speculative projections, the jury could reasonably

have found both material causation and non-speculative damages.[9]

## CONCLUSION

We have considered Ingevity's remaining arguments but find them unpersuasive. For the foregoing reasons, we affirm the district court's denial of JMOL and uphold the jury verdict of antitrust liability and damages.

## **AFFIRMED**

---

[9]    Because *Daubert* rulings are reviewed only for abuse of discretion, *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 391 (3d Cir. 2016), Ingevity's *Daubert* argument fails for the same reasons as its merits argument.